08-3181-cv
v. Abboud

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2008

(Argued: October 22, 2008    Decided: June 10, 2009)

Docket No. 08-3181-cv

_____

JA APPAREL CORP.,

Plaintiff-Counterclaim-
Defendant-Appellee,

- v. -

JOSEPH ABBOUD, HOUNDSTOOTH CORP., HERRINGBONE
CREATIVE SERVICES, INC.,

Defendants-Counterclaimants-
Appellants,

- v. -

MARTIN STAFF,

Counterclaim-Defendant-
Appellee.
_____

Before: KEARSE, SACK, and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Theodore H. Katz, Magistrate Judge, permanently enjoining defendants from using the name "Joseph Abboud" commercially.

Vacated and remanded for further proceedings.

Judge Sack concurs, in a separate opinion.

THOMAS A. SMART, New York, New York (Phillip A. Geraci, Richard A. De Sevo, Michael Denvir (pending admission), Kaye Scholer, New York, New York, on the brief), for Plaintiff-Counterclaim-Defendant-Appellee and Counterclaim-Defendant-Appellee.

RANDY LIPSITZ, Kramer Levin Naftalis & Frankel, New York, New York (Louis Ederer, Arnold & Porter, New York, New York, on the brief) for Defendants-Counterclaimants-Appellants.

KEARSE, Circuit Judge:

Defendants Joseph Abboud ("Abboud") et al. appeal from so much of a final judgment entered in the United States District Court for the Southern District of New York following a bench trial before Theodore H. Katz, Magistrate Judge, as permanently enjoined them from using, inter alia, the name "Joseph Abboud" to sell, market, or promote, goods, products, or services to the consuming public, and dismissed their counterclaims against plaintiff JA Apparel Corp. ("JA Apparel" or "JA") and counterclaim-defendant Martin Staff alleging improper use of Joseph Abboud's name. The district court found that JA, Abboud, and defendant Houndstooth Corp. ("Houndstooth") had entered into an unambiguous contract pursuant to which Abboud and Houndstooth sold to JA the exclusive rights to the commercial use of the name "Joseph Abboud" and trademarks containing that name, and that Abboud's proposed use of his name in connection with a new line of clothing would breach the terms of that sale agreement and infringe trademarks sold to JA. On appeal, defendants contend

- 2 -

principally that the district court misinterpreted the sale agreement, erred in rejecting their defense of fair use, and fashioned an overly broad injunction. For the reasons that follow, we conclude that the district court erred in finding that the sale agreement is unambiguous and in declining therefore to consider extrinsic evidence as to the contracting parties' intent. We also conclude that the judgment cannot be upheld on the basis of the court's rulings on the trademark issues. We thus vacate the judgment and remand for further proceedings on the contract issue and, if necessary, on the trademark issues.

## I. BACKGROUND

The following facts are taken from the district court's findings after trial, see JA Apparel Corp. v. Abboud, No. 07 Civ. 7787, 2008 WL 2329533 (S.D.N.Y. June 5, 2008) ("JA Apparel"), and, unless otherwise indicated, are not disputed.

## A. The Parties

Abboud is a world-famous fashion designer and philanthropist whose work in both capacities has garnered numerous honors and awards. Defendants Houndstooth and Herringbone Creative Services, Inc. ("Herringbone"), are companies wholly owned by Abboud. Since 1987, Abboud's personal name "Joseph Abboud" has been registered as a trademark with the United States Patent and Trademark Office.

- 3 -

JA is a corporation engaged in the manufacture, marketing, and sale of products using "Joseph Abboud" trademarks; Martin Staff is JA's chief executive officer. JA was formed in 1988 as a joint venture between Houndstooth and GFT International B.V. ("GFT") and operated under a license from Abboud. In 1996, GFT purchased Houndstooth's interest in JA, thereby becoming JA's sole owner. The 1988 license was canceled and Abboud issued new licenses to JA.

B. The Sale Agreement

In 2000, Abboud, Houndstooth, and JA entered into an Agreement of Purchase and Sale dated June 16, 2000, and executed on July 13, 2000 ("Sale Agreement" or "Agreement"), for the sale of certain assets to JA. The Sale Agreement provided in pertinent part that Abboud and Houndstooth would, in exchange for the payment to Abboud of $65.5 million, transfer to JA all of their right, title and interest in and to:

(A) The names, trademarks, trade names, service marks, logos, insignias, and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks"), together with all causes of action (and the proceeds thereof) in favor of [Abboud and Houndstooth] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined).

(B) All licenses to use the Trademarks granted by Houndstooth or Abboud . . . (collectively, the "License Agreements").

(C) All rights to use and apply for the registration of new trade names, trademarks,

- 4 -

service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

(D) All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.

(E) The goodwill of or pertaining to the Trademarks. (The items referred to in clauses (A) through (E) of this Section 1.1(a) are collectively referred to as the "Assets").

(Sale Agreement ¶ 1.1(a) (emphasis in original).) The Agreement defined "Intellectual Property," referred to in ¶ 1.1(a)(A), as "all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by [Abboud and Houndstooth] in connection with the Trademarks" listed in "Schedule 1.1(a)(A)." (Id. ¶ 3.6(a) (emphasis in original).)

Schedule 1.1(a)(A), referred to in ¶¶ 1.1(a)(A) and 3.6(a), bore the title "Joseph Abboud/J.A. Apparel," with a subheading "Trademark Report by Mark." It listed pending and completed trademark and service mark registrations in various countries, grouped largely by type of design, with headings such as "Diamond and Rectangle Design," "Miscellaneous Diamond Design," "Joseph Abboud," "Joseph Abboud & Design," and "Joseph Abboud and Miscellaneous Diamond Design."

In conjunction with their execution of the Sale Agreement on July 13, 2000, Abboud and JA also executed a Personal Services

- 5 -

Agreement that was to span a total of seven years. In the Personal Services Agreement, Abboud agreed that for the first five years he would provide personal services to JA (the "personal services period") by, inter alia, becoming "Chairman Emeritus" and supplying ideas for the design and marketing of "Joseph Abboud" products. For two additional years, Abboud agreed not to compete with JA (the "non-compete period").

C. The Present Action

During the non-compete period of the Personal Services Agreement, which ended on July 13, 2007, Abboud undertook, in part through Herringbone, preparations for the design and launch of a new collection of high-end men's clothing for sale under the label "jaz" in the fall of 2008. Abboud's plans became public in two articles published on August 6, 2007, one in the Wall Street Journal--Ray A. Smith, What's in a Name? Not Much, He Hopes, Wall Street Journal, Aug. 6, 2007, at B1--and the other in DNR, the leading magazine of the men's fashion industry. The DNR article initially stated that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials." David Lipke, All That Jaz: Abboud Unveils His New Label, DNR, Aug. 6, 2007, at 12. At Abboud's request, however, DNR issued a "Clarification" that stated, "according to Abboud and his attorney, . . . the designer . . . is, in fact, allowed to use his name on marketing and advertising materials for Jaz." DNR, Aug. 13, 2007, at 5.

- 6 -

JA commenced the present action on September 4, 2007. Its complaint alleged principally that Abboud's proposed use of his personal name to sell the "jaz" brand breached the Sale Agreement and constituted trademark infringement in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and New York common law. The complaint also contained claims of, inter alia, false designation of origin and trademark dilution in violation of §§ 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a) and (c), and New York General Business Law ("N.Y. Gen. Bus. Law") § 360-1, and false and deceptive trade practices in violation of N.Y. Gen. Bus. Law §§ 349-50. JA requested damages and permanent injunctive relief, and it moved for a preliminary injunction.

Abboud, Houndstooth, and Herringbone denied wrongdoing and asserted defenses of, inter alia, trademark fair use and unclean hands. They also asserted counterclaims alleging that JA and Staff had improperly used Abboud's name in connection with "Joseph Abboud" products following the expiration of the Personal Services Agreement's personal services period. The counterclaims alleged that JA and Staff had thereby engaged in, inter alia, false endorsement, false advertising, and unfair competition, and had violated New York civil rights laws. The counterclaims requested injunctive relief and damages.

The parties consented to have the proceedings conducted before a magistrate judge. They also agreed to have the magistrate judge conduct a hearing on JA's preliminary injunction motion consolidated with trial on the merits.

- 7 -

Prior to the trial, JA moved in limine to exclude parol evidence as to the meaning of the Sale Agreement. However, as the parties' submissions on that motion were not completed before the eve of trial, the magistrate judge reserved judgment on the motion, stating that he would allow the parties to present parol evidence but that he would not consider that evidence if he found the Sale Agreement to be unambiguous.

At trial, therefore, the parties presented "fairly extensive extrinsic evidence" as to the meaning of the Sale Agreement, JA Apparel, 2008 WL 2329533, at *8, including correspondence, meeting minutes, testimony by the negotiating attorneys, and other documentation of the drafting process. In addition, on the trademark issue, the court received, inter alia, testimony from Abboud about his proposed use of his name and "mock-ups" of proposed "jaz" advertisements displaying his name in various ways. (See Part II.B. below.)

In an opinion issued on June 5, 2008, the court found the Sale Agreement to be unambiguous, and it thus declined to consider the parties' parol evidence. As discussed in Part II.A. below, the court found that the Sale Agreement unambiguously conveyed to JA "all of Abboud's rights to use his name for commercial purposes," JA Apparel, 2008 WL 2329533, at *9. The court found that Abboud's planned use of his name to market "jaz" would thus constitute a breach of contract. Id. at *16.

Although finding that its decision on the contract claim made it largely unnecessary to rule on JA's trademark infringement

- 8 -

claims, see id., the court addressed the Lanham Act infringement claim in the interest of completeness and concluded that "Abboud's proposed use of his name in connection with the 'jaz' line would also constitute trademark infringement . . . ." Id. The court stated that JA had

> already established that it purchased the exclusive right to the Joseph Abboud name for commercial purposes, and, therefore, any proposed use by Abboud of his name commercially is improper. Moreover, in this specific case, it is difficult to analyze the trademark claims in isolation from the Agreement because Abboud not only sold the rights to his name, he also sold the rights to use and apply for the registration of, among other things, new trademarks or designations containing the words "Joseph Abboud," "by Joseph Abboud," "designed by Joseph Abboud," and "JOE," or anything similar to or derivative of those phrases. Thus, what may have constituted a permissible use of Abboud's name under the Lanham Act is largely foreclosed by the express terms of the Agreement.

Id. The court further explained that Abboud had not met his burden of establishing a trademark defense of fair use, stating, inter alia, that

> Abboud is attempting to use his name, and the goodwill associated with it, to identify and distinguish goods, and to advise consumers that he is the source of his new "jaz" line. Therefore, although there is a descriptive component to Abboud's proposed uses, the Court concludes that he is also attempting to use his name, at least in part, as a trademark and that the confusion generated by his proposed uses would be far more than incidental. It is patently obvious that consumers seeing JA Apparel's products, marked or advertised as "Joseph Abboud" or "by Joseph Abboud," would be utterly confused as to whether the "jaz" products advertised as "by designer Joseph Abboud," were derived from the same source.

Id. at *20.

- 9 -

In addition, the court rejected defendants' unclean-hands defense and counterclaims, which asserted that JA had used Abboud's name unfairly, after the end of the personal services period, to indicate his personal endorsement of JA products. The court concluded that JA had not acted in bad faith by creatively using the Joseph Abboud name and trademarks it had purchased to promote its brand. See id. at *34 & n.41.

The court entered judgment accordingly and permanently enjoined Abboud from "using his personal name to sell, market, or otherwise promote, goods, products, and services to the consuming public." Judgment, decretal ¶ 3.

## II. DISCUSSION

On appeal, defendants contend principally that the district court misinterpreted the Sale Agreement as evincing Abboud's intent to convey to JA all of his rights to use his name for commercial purposes. They argue that the transactional documents and the surrounding circumstances made it clear that Abboud did not intend to sell his name other than as a brand name, service mark, or trademark. They also contend that the district court erred in rejecting their trademark defense of fair use, in issuing an injunction that is unduly broad, and in rejecting their unclean-hands defense and counterclaims premised on JA's alleged misuse of Joseph Abboud's name and persona. For the reasons that follow, we conclude (a) that the district court erred in ruling

- 10 -

that the Sale Agreement unambiguously conveyed all of Abboud's rights to use his name commercially, and (b) that that error affected several of its other rulings, and we therefore remand for further proceedings.

A.   The Contract Claim

Under New York law, which the parties agree governs their contract dispute, the question of whether a written contract is ambiguous is a question of law for the court. See, e.g., Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 429 (2d Cir. 1992) ("Seiden"). "Ambiguity is determined by looking within the four corners of the document, not to outside sources . . . ." Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356 (1998). Contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Breed v. Insurance Company of North America, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978); see, e.g., Seiden, 959 F.2d at 428. "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989). Rather, "[a]mbiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is

cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) ("Revson") (quoting Seiden, 959 F.2d at 428 (other internal quotation marks omitted)); see, e.g., Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) ("contract is ambiguous where reasonable minds could differ on what a term means"). We review de novo the district court's decision as to whether a contract is ambiguous. See, e.g., Revson, 221 F.3d at 66; Tourangeau v. Uniroyal, Inc., 101 F.3d 300, 306 (2d Cir. 1996); Seiden, 959 F.2d at 429.

If the contract is unambiguous, its meaning is likewise a question of law for the court to decide. See, e.g., Revson, 221 F.3d at 66; K. Bell & Associates v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996). In interpreting an unambiguous contract, the court is to consider its "[p]articular words" not in isolation "but in the light of the obligation as a whole and the intention of the parties as manifested thereby," Kass v. Kass, 91 N.Y.2d at 566, 673 N.Y.S.2d at 356-57, but the court is not to consider any extrinsic evidence as to the parties' intentions, see, e.g., Seiden, 959 F.2d at 428; Metropolitan Life Insurance Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990).

However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered. See, e.g., Seiden, 959 F.2d at 426, 429; In re Consolidated Mutual Insurance Co., 77 N.Y.2d 144, 150, 565

- 12 -

N.Y.S.2d 434, 436 (1990); <u>67 Wall Street Co. v. Franklin National Bank</u>, 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915, 918 (1975). Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder. <u>Revson</u>, 221 F.3d at 66; <u>Consarc Corp. v. Marine Midland Bank, N.A.</u>, 996 F.2d 568, 574 (2d Cir. 1993); <u>Rothenberg v. Lincoln Farm Camp, Inc.</u>, 755 F.2d 1017, 1019 (2d Cir. 1985).

In the present case, addressing the threshold question of ambiguity, we conclude that the scope of the right to use Abboud's name conveyed by the Sale Agreement is ambiguous. In ¶ 1.1(a)(A) of the Agreement, set out in full in Part I.B. above, Abboud and Houndstooth transferred to JA all their right, title, and interest to

> [t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on <u>Schedule 1.1(a)(A)</u>, and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks").

(Sale Agreement ¶ 1.1(a)(A) (emphasis in original).) JA contended, and the district court agreed, that this language unambiguously conveyed to JA all right to use Joseph Abboud's name commercially. The court reached this conclusion based on the use of the phrase "[t]he names":

> <u>Abboud agreed to sell all rights to</u>, among other things, <u>the "names" on Schedule 1.1(a)(A)</u>, and <u>the name Joseph Abboud appears repeatedly on that schedule</u>. Alternatively stated, if Abboud only intended to convey trademarks, then the Agreement could have and should have said: "Abboud agrees to sell . . . all of [his] right, title and interest in and to the trademarks identified on Schedule 1.1(a)(A)." But it said more than that, and <u>in order to give the word "names" due meaning and effect, the</u>

- 13 -

> Court must interpret the Agreement in a manner that provides JA Apparel with that which it expressly purchased--all of Abboud's rights to use his name for commercial purposes.

JA Apparel, 2008 WL 2329533, at *9 (emphases added).

We cannot agree that the Sale Agreement unambiguously so provided. Preliminarily, we note that although that court stated that JA "expressly" purchased "all of Abboud's rights to use his name for commercial purposes," id., there is in fact no such language in the Agreement. The court may have been influenced by its apparent acceptance of JA's contention that

> it would defy common sense to accept the premise that JA Apparel paid $65.5 million to acquire the . . . right to use "Joseph Abboud" or "by Joseph Abboud" as a trademark, while agreeing to let Abboud use the exact same words with respect to a competing clothing line, but in a non-trademark sense,

JA Apparel, 2008 WL 2329533, at *22. However, the fact that JA paid a large price for the Joseph Abboud brand (and existing licensing agreements) does not necessarily mean that JA purchased the right to prohibit Abboud from using his name to refer to himself in a non-trademark sense. There is no provision in the Sale Agreement conveying "all of Abboud's rights to use his name for commercial purposes," JA Apparel, 2008 WL 2329533, at *9, and the district court was not entitled to supply such a provision in the name of common sense, much less to call it "express[]," id.

Nonetheless, the court's interpretation of the Agreement as conveying to JA all commercial right to use Joseph Abboud's name is a plausible reading of the word "names" in ¶ 1.1(a)(A),

- 14 -

given that that word is unadorned and that the name "Joseph Abboud" is used many times in Schedule 1.1(a)(A).

Defendants contend, however, that the word "names" in ¶ 1.1(a)(A) was intended to mean only brand names, and their interpretation is reasonable in light of several aspects of the Agreement. First, such an interpretation is reasonable given that brand names are similar to the items immediately following the word "names" in that paragraph, to wit "trade names, service marks, logos[ and] insignias." And, indeed, ¶ 1.1(a)(A) itself defined all of these terms--along with the registrations, applications, and associated goodwill--as "(collectively the 'Trademarks')," a term that would seem to connote existing or pending uses. If JA intended to acquire "all of Abboud's rights to use his name for commercial purposes," JA Apparel, 2008 WL 2329533, at *9 (emphasis added), the Agreement could have said, instead of simply "names," "the names 'Abboud' and 'Joseph Abboud,'" and done so without the accompanying reference to the schedule of existing and pending uses of the names.

Second, given that ¶ 1.1(a)(A) conveyed "[t]he names . . . identified on Schedule 1.1(a)(A)" (emphasis in original), it is reasonable to read that paragraph as conveying those names in the context in which they were shown in that Schedule. That Schedule listed foreign and domestic trademark and service mark registrations that had been completed or were pending. (See, e.g., Sale Agreement ¶ 3.6(a) (describing Schedule 1.1(a)(A) as a list of "registrations and applications currently used by [Abboud

and Houndstooth]").) Registrations and applications "currently used" plainly did not exhaust Abboud's right to use his name in the future.

Finally, ¶ 1.1(a)(A) is not the only paragraph in which Abboud and Houndstooth conveyed rights. In subparagraph (C) of ¶ 1.1 they also conveyed

> [a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

(Sale Agreement ¶ 1.1(a)(C).) If, as the district court concluded, the word "names" in ¶ 1.1(a)(A) conveyed "all of Abboud's rights to use his name for commercial purposes," JA Apparel, 2008 WL 2329533, at *9 (emphasis added), there would have been no need for the parties to add subparagraph (C) to give JA the right to use and apply for new registrations of marks "containing the words 'Joseph Abboud.'" Under the district court's interpretation of the Agreement, subparagraph (C) is redundant. Such redundancy itself makes the unadorned word "names" in ¶ 1.1(a)(A) ambiguous.

JA contends that "[s]ection [sic] 1.1(a)(C) clearly conveyed the right to use 'Joseph Abboud' and 'designed by Joseph Abboud' 'or anything similar thereto or derivative thereof,' as designations regardless of whether used as a trademark." (JA brief on appeal at 30.) This reading of ¶ 1.1(a)(C) would

- 16 -

enhance, rather than eliminate, the redundancy of subparagraph (C) if "names" in ¶ 1.1(a)(A) is interpreted as all rights to use Abboud's name. Further, although JA is correct that the language of subparagraph (C) clearly gave JA the right to use Abboud's name in more than trademarks--given that it conveyed "[a]ll rights to use and apply for registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,'" etc. (Sale Agreement ¶ 1.1(a)(C))--it did not clearly grant the right to "use" Abboud's name other than as it would be "contain[ed]" in such new names, marks, and logos, etc.

If, as defendants contend, the word "names" in ¶ 1.1(a)(A) means brand names or those uses of the names "identified on" Schedule 1.1(a)(A) as existing or pending uses, subparagraph (C) is not redundant. Interpreted in this way, ¶ 1.1(a)(A) simply conveyed to JA the right to all existing brands and marks and all marks for which application had been made (referred to in ¶ 3.6(a) as "current[]" "Trademarks"), while ¶ 1.1(a)(C) conveyed to JA the right to use Joseph Abboud's name in applying for new marks (indeed, defined in ¶ 1.1(a)(C) as "(collectively, the 'New Trademarks')"). Nothing in these conveyances of the rights to use Abboud's name in the current marks or in new marks, however, used any form of the word "exclusivity" or stated in words that Abboud could not make non-trademark use of his name in connection with his new creations following the end of the non-compete period.

Given the above conflicting interpretations of the Sale Agreement, we conclude that the intended meaning of the word "names" in ¶ 1.1(a)(A), on which the district court's rulings turned, is ambiguous. Given the ambiguity, the parties were entitled to submit extrinsic evidence as to the intent with which they entered into the Agreement, and the court should have considered that evidence in determining whether JA had met its burden of proving that Abboud breached the Agreement.

B. The Lanham Act Trademark Claim

The district court also ruled against defendants on the ground that Abboud's proposed use of his name in conjunction with his new "jaz" line of clothing would constitute trademark infringement in violation of the Lanham Act. We note that the issues in the litigation had been limited, with the dispute centering on Abboud's right to use his name in advertising. As the district court described the parties' respective positions, defendants "conceded that they [we]re not seeking to use the Joseph Abboud name on clothes, labels, or hang-tags for the 'jaz' line"; Abboud merely wanted "to be able to use his name in advertising materials . . . to be able to identify himself in text as the designer of the . . . jaz products that are at issue." JA Apparel, 2008 WL 2329533, at *6 n.4 (internal quotation marks omitted). JA, for its part, conceded that it was "not seeking to prevent Abboud from being in business and competing, or personally presenting his new 'jaz' line to prospective purchasers, such as

Bloomingdale's," but it sought to prohibit Abboud from using his name in "advertising." Id. ("'[O]nce he starts advertising, then he's trading on the same reputation that is, in fact, merged into the goodwill of the brand that he sold to us.'" (quoting counsel for JA)). Both sides introduced mock-ups of Abboud's proposed advertisements.

In the district court, as here, defendants effectively conceded that JA owned valid "Joseph Abboud" trademarks and that it had made a prima facie showing under the Polaroid test, Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961); see, e.g., Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 742 (2d Cir. 1998), that the use of his name as a trademark would likely cause confusion, see, e.g., Mattel, Inc. v. Azrak-Hamway International, Inc., 724 F.2d 357, 360-61 (2d Cir. 1983) ("Mattel") ("confusion" means whether "consumers [have been] misled into believing that the two [products] came from the same source"). But defendants contended that they were entitled, under the Lanham Act, to the defense of fair use, which is not defeated by the existence of some confusion, see KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 121-22 (2004). Such a defense is available to a defendant who establishes, to the extent pertinent here,

> [t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . .

- 19 -

15 U.S.C. § 1115(b)(4).

Assessment of this defense thus requires analysis of whether a given use was "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 64 (2d Cir. 2000) ("EMI"). In making these assessments, the court focuses on the actual or proposed uses themselves. See, e.g., id. at 66-68 (evaluating both a mock-up and the final version of an allegedly infringing commercial); see also TCPIP Holding Co. v. Haar Communications, Inc., 244 F.3d 88, 104 (2d Cir. 2001); Venetianaire Corp. of America v. A & P Import Co., 429 F.2d 1079, 1082 (2d Cir. 1970). In addressing defendants' fair-use defense, the district cited the above three elements of the defense, see JA Apparel, 2008 WL 2329533, at *18, but its analysis of the first and third elements, discussed below, gives us pause.

With respect to the first element, we have equated "use . . . as a mark" with "the use of [a] term as a symbol to attract public attention." Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 499 (2d Cir. 1962). Compare id. (term was used as a mark where it was obviously employed "as a symbol to attract public attention"), with Mattel, 724 F.2d at 361 (phrase was used otherwise than as a mark where it "was located on the package in a place and manner that only the close reader would notice"). See also Restatement (Third) of Unfair Competition § 28 comment c (noting the relevance of the "physical nature of the use

- 20 -

in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks," as well as the "presence or absence of precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense").

With respect to the third element of the fair-use defense, the inquiry into the defendant's good faith "concerns the question whether the user of a mark intended to create consumer confusion as to source or sponsorship." EMI, 228 F.3d at 66-67; see also id. at 66 (noting that in "analyzing the proper scope of fair use good faith, precedents discussing good faith as the sixth Polaroid factor . . . are relevant because the focus of the inquiry is the same"); Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1339 (2d Cir. 1975) (analysis of the sixth Polaroid factor requires inquiry as to whether the alleged infringer had a "deliberate intent to infringe").

The district court in the present case indicated that defendants may have established the second element of their fair-use defense, as it noted that "such phrases as 'by the award-winning designer Joseph Abboud'" have "a descriptive component." JA Apparel, 2008 WL 2329533, at *19. But it found that defendants had not established the otherwise-than-as-a-mark and good-faith elements. As to the latter, the court stated, inter alia, that "in the context of the good faith analysis under the 'fair use' doctrine, it must be noted that Abboud is attempting to use that

- 21 -

which he expressly sold to [JA]."  Id.  As to the former, the court stated that

> Abboud is attempting to use his name, and the goodwill associated with it, to identify and distinguish goods, and to advise consumers that he is the source of his new "jaz" line.  Therefore, although there is a descriptive component to Abboud's proposed uses, the Court concludes that he is also attempting to use his name, at least in part, as a trademark and that the confusion generated by his proposed uses would be far more than incidental.  It is patently obvious that consumers seeing JA Apparel's products, marked or advertised as "Joseph Abboud" or "by Joseph Abboud," would be utterly confused as to whether the "jaz" products advertised as "by designer Joseph Abboud," were derived from the same source.

Id. at *20.

With respect to the good faith issue, we conclude that the district court applied a standard that was erroneous for at least two reasons.  First, giving effect, respectively, to the end and the beginning of the above passage from *20, we note that the district court found that consumers would be confused by Abboud's proposed use of his name, but that Abboud was not attempting to confuse.  Rather than finding an attempt to confuse, the court found that Abboud was "attempting" to "distinguish" his clothing from that of JA and to "advise consumers that he is the source of his new 'jaz' line" (emphases added).  Thus, the court's finding of a lack of good faith could not be premised--as required by our fair-use precedents--on an intent to confuse.

Second, the court's actual premise for finding that Abboud's proposed use of his name was not in good faith was its conclusion that the Sale Agreement unambiguously conveyed to JA

- 22 -

all right to use Abboud's name commercially. See, e.g., JA Apparel, 2008 WL 2329533, at *19 ("in the context of the good faith analysis under the 'fair use' doctrine, it must be noted that Abboud is attempting to use that which he expressly sold to [JA]"); id. (finding it "very difficult, if not improper, to completely ignore the Agreement in the context of Abboud's 'fair use' defense"); id. at *16 ("[as JA] established that it purchased the exclusive right to the Joseph Abboud name for commercial purposes, . . . any proposed use by Abboud of his name commercially is improper" (emphases added)); id. ("what may have constituted a permissible use of Abboud's name under the Lanham Act is largely foreclosed by the express terms of the Agreement"). As the district court's premise that the Sale Agreement was an unambiguous all-commercial-use-encompassing conveyance was erroneous (see Part II.A. above), its rejection of the fair-use defense on the basis that there could be no good-faith use of what the court viewed as having been sold was likewise erroneous.

In sum, given that the district court found that Abboud was attempting to distinguish the "jaz" line from JA products-- which is inconsistent with an intent to confuse--and that its finding as to lack of good faith rested on its erroneous view of the Sale Agreement, the court's finding that Abboud's proposed advertising use of his name was not in good faith lacked any proper foundation.

With respect to whether Abboud sought to "use" his name "otherwise than as a mark," 15 U.S.C. § 1115(b)(4), our principal

difficulty with the district court's conclusion is that the court appears to have resolved this question without considering the proposed uses themselves. Although there is a sentence in the background section of the court's opinion in which the court, in describing defendants' contentions, mentions the presentation of advertisement mock-ups, see JA Apparel, 2008 WL 2329533, at *5, the mock-ups are not mentioned again, and the court gives no indication of having considered such matters as the size, location, or context of the "Joseph Abboud" name in comparison with the appearance of other descriptive matter in any given proposed advertisement, or the likely effect of any given proposed advertisement as a whole.

Our review of the record persuades us that individualized consideration of the various proposed advertisements is needed. For example, in some of the 8½-by-11-inch mock-ups, the "jaz" name is displayed prominently in script some three inches high; in others it is about one inch high. In the latter mock-ups, beneath the "jaz" logo are the words--all in type smaller than "jaz"--"A New Composition by JOSEPH ABBOUD" in solid capitals, with the name "JOSEPH ABBOUD" in larger capitals than the rest. (JA Exhibits 41-42.)

On the other hand, in several advertisements in which the "jaz" logo is some three inches high, the tagline below "jaz" does not mention Abboud but rather reads "An american Luxury collection" in letters about ¼ of an inch high. (JA Exhibit 43.) In these mock-ups, a picture of Abboud appears on the far right

side, and in the bottom corner, below the image of Abboud, is the following text:

> Designer Joseph Abboud in a 2 Button Super 120 S Charcoal Chalkstripe from His Fall 2008 Jaz Collection

> Designer Joseph Abboud Is No Longer Associated or Affiliated with JA Apparel Corp., the Owner of the Trademark "Joseph Abboud"$^{TM}$.

(Id.) This text is in letters approximately 1/16 of an inch high.

As indicated above, resolution of a fair-use defense requires the court to focus on the defendant's (actual or proposed) use. We see no indication that the district court considered the advertisement mock-ups submitted by the parties here, where given mock-ups could lend themselves to divergent conclusions as to, inter alia, whether Abboud's name was being used a trademark, whether consumers would likely be confused and believe the "jaz" line comes from JA, and whether a particular size and placement of Abboud's name in a mock-up evinced an intent to confuse.

In the event that the district court does not rule in favor of JA on the contract claim on remand, it will be required to address the trademark issues.

C. Other Issues

Defendants have raised other issues on this appeal, including challenges to the dismissal of their defense of unclean hands, the dismissal of their counterclaims based on the same factual assertions, and the breadth of the permanent injunction

issued by the district court. In light of our decision vacating the judgment and remanding for further proceedings on the ground that the district court's principal rationales were erroneous, we decline to address these additional contentions, except to note that an injunction of scope similar to that originally entered would seem to be inappropriately broad if based solely on trademark infringement rather than on breach of contract. The district court is free on remand to revisit that matter, as well as the other appellate issues raised by defendants and the claims of JA that the court dismissed as duplicative of the claims on which JA originally prevailed.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

JA Apparel Corp. v. Joseph Abboud et al., No. 08-3181-cv

SACK, Circuit Judge, concurring.
------------------------------------------------------------

I concur in the panel's opinion with respect to JA Apparel Corp.'s Lanham Act claim. I concur in the result with respect to the contract claim, but depart from the panel's reasoning. While I agree that the term "names" -- as it appears in ¶ 1.1(a)(A) of the Agreement of Purchase and Sale dated June 16, 2000 ("Sale Agreement") -- is ambiguous, I would, respectfully, reach that conclusion by a different route.

In ¶ 1.1(a), Joseph Abboud promised to "sell, convey, transfer, assign and deliver to [JA Apparel] . . . all of [his] right, title and interest in and to," inter alia,

> (A) The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks") . . . and all other Intellectual Property (as hereinafter defined).

> (B) All licenses to use the Trademarks granted by [Abboud] . . . .

> (C) All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar to or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products and services.

Sale Agreement ¶ 1.1(a) (underline in original). Schedule 1.1(a)(A) to the Sale Agreement contains a five-page list of trademarks -- the words "Trademark Report by Mark" appear at the top left corner of each page -- including, for each listed mark, information such as the countries of registration, reference numbers, dates filed, and registration numbers. A sixth page consists of a "Filing Receipt for Trademark Application" for a mark containing "the words JOSEPH ABBOUD." The question before us is whether the term "names" in ¶ 1.1(a)(A) is ambiguous.

JA Apparel asserts that ¶ 1.1(a)(A) unambiguously conveys to it, through that term, rights to Abboud's personal name, at least for commercial purposes. Abboud insists that it unambiguously conveys rights to Abboud's trade and service marks only. The parties have staked the expense of a trial and an appeal on their positions. The district court initially thought both interpretations were plausible enough to warrant a trial on the contract claim. After a bench trial, however, the court decided ¶ 1.1(a)(A) was not ambiguous, agreeing with JA Apparel's interpretation of the words at issue. This rendered the "fairly extensive" extrinsic evidence the court had received "legally irrelevant." JA Apparel Corp. v. Abboud, 591 F. Supp. 2d 306, 318 & n.9 (S.D.N.Y. 2008).

I. Applicable New York Law

2

I would settle the question whether ¶ 1.1(a)(A) is ambiguous by reference to several familiar rules of contract interpretation used to determine "the manifest purpose" of the parties to an agreement. In re Herzog, 301 N.Y. 127, 135, 93 N.E.2d 336, 339 (1950). When an agreement is "clear" and "complete," that purpose is determined by reference only to the contract's terms: "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990). When a contract term is "reasonably susceptible to more than one interpretation," however, it is ambiguous as to the parties' intent. Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999).

Whether a term is ambiguous is a matter of law for the court to resolve. W.W.W. Assocs., 77 N.Y.2d at 162, 566 N.E.2d at 642, 565 N.Y.S.2d at 443.[1] If the court identifies an ambiguity, the controlling meaning is determined by application of principles of interpretation and construction under the controlling state law. See, e.g., Wallace v. 600 Partners Co.,

---

[1] "[C]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 869 N.Y.S.2d 511, 517, 60 A.D.3d 61, 67 (1st Dep't 2008).

3

86 N.Y.2d 543, 548, 658 N.E.2d 715, 717, 634 N.Y.S.2d 669, 671 (1995); Rentways, Inc. v. O'Neill Milk & Cream Co., 308 N.Y. 342, 347, 126 N.E.2d 271, 273 (1955). Then, only if necessary, extrinsic evidence of the parties' intent is employed. See W.W.W. Assocs., 77 N.Y.2d at 163, 566 N.E.2d at 642, 565 N.Y.S.2d at 443.

> It is a generally accepted proposition that where the terms of a writing are plain and unambiguous, there is no room for interpretation or construction . . . . However, this formulation may be technically overbroad, in the sense that the interpretation of a contract requires an initial determination of whether the contract is ambiguous . . . and this determination itself involves an assessment of the contract's meaning.

Richard A. Lord, 11 Williston on Contracts § 30:4 (4th ed. 2008). At least some principles of interpretation therefore ordinarily guide the inquiry into whether a contract term is ambiguous.

New York courts conducting the inquiry typically apply three rules of interpretation.

First, they determine ambiguity by "examin[ing] the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed," interpreting "[p]articular words . . . not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." Kass v. Kass, 91 N.Y.2d 554, 566, 696 N.E.2d 174, 180-81, 673 N.Y.S.2d 350, 356-57 (1998)

4

(quoting Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519, 524, 159 N.E. 418, 419 (1927)); see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 173 (2d Cir. 2004) ("An ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal quotation marks omitted)).

Second, the New York courts apply the rule that each term is to be assigned its "fair and reasonable meaning." Sutton v. E. River Sav. Bank, 55 N.Y.2d 550, 555, 435 N.E.2d 1075, 1078, 450 N.Y.S.2d 460, 463 (1982) (internal quotation marks omitted); see also Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459, 141 N.E.2d 590, 593, 161 N.Y.S.2d 90, 93 (1957) ("reasonable and ordinary meaning").

Third, they apply the rule "that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect," Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 599, 176 N.E.2d 37, 38, 217 N.Y.S.2d 1, 3 (1961) (citation, ellipsis, and internal quotation marks omitted), i.e., the rule against surplusage.

For example, in <u>R/S Associates v. New York Job Development Authority</u>, 98 N.Y.2d 29, 771 N.E.2d 240, 744 N.Y.S.2d 358 (2002), an opinion by then-New York Court of Appeals Judge Wesley, the Court of Appeals addressed "the interpretation of the term 'effective cost of funds' in a loan agreement" which provided that the rate to be charged by the lender for the loan in question "'may be revised from time to time but will not exceed one and one half (1½%) percent over [the lender's] effective cost of funds.'"  <u>Id.</u> at 31, 32, 771 N.E.2d at 241, 744 N.Y.S.2d at 359.  The purchaser and the lender disputed whether the phrase "effective cost of funds" included -- in addition to the interest on the bonds issued to finance the loan and the direct costs of issuance -- "the cost of defaults by other borrowers."  <u>Id.</u> at 32, 771 N.E.2d at 241, 744 N.Y.S.2d at 359. The purchaser argued that the phrase unambiguously excluded the cost of defaults, the lender argued that the phrase unambiguously included it.  <u>See</u> <u>id.</u>

The Court of Appeals concluded that the phrase was unambiguous and reasonably susceptible to only the lender's proposed meaning.  It reached that conclusion by applying the reasonable meaning rule and the rule against surplusage:

> <u>Under its ordinary usage</u>, the 'effective' cost of the funds means the 'actual' cost of securing such funds for a specific loan (<u>see,</u> <u>e.g.</u>, 5 Oxford English Dictionary 80 [2d ed 1989] . . . ).  Regardless of borrower defaults, the [lender]'s funding mechanism

6

> required it to repay the underlying bond when due. Thus, the 'actual' or 'effective' cost of the funds loaned by the [lender] necessarily included the interest it had to pay to the bondholders, the cost of issuing the bond, and the cost of defaults by the borrowers who received loans from bond proceeds. <u>Any other interpretation of this agreement would ignore the import of "effective" in modifying "cost of funds</u>."

<u>Id.</u> at 33, 771 N.E.2d at 242, 744 N.Y.S.2d at 360 (some emphases added, some emphases in original omitted).

The ambiguity inquiry commonly involves the application of these three rules. <u>See also</u> <u>Golden Gate Yacht Club v. Societe Nautique De Geneve</u>, -- N.Y.3d --, -- N.E.2d --, -- N.Y.S.2d --, 2009 N.Y. Slip Op. 02480, at 6 (Apr. 2, 2009) ("Taken as a whole, we conclude that the settlor intended to link the annual regatta requirement to the other eligibility requirements . . . . Any other interpretation would render the annual regatta requirement a nullity. . . . We conclude there is no ambiguity as to the annual regatta clause at issue."); <u>S. Road Assocs., LLC v. IBM Corp.</u>, 4 N.Y.3d 272, 277-78, 826 N.E.2d 806, 809, 793 N.Y.S.2d 835, 838 (2005) (concluding that a lease read "as a whole" reflects that "the term 'premises' refers only to the interior space" of the leased real property, because "[t]he lease repeatedly mentions the 'premises' separately from the water tower, appurtenances, land, parking lot[,] and building," which language "would be superfluous" if the term "premises" covered those exterior areas); <u>Kass</u>, 91 N.Y.2d at 568, 696 N.E.2d at 181,

7

673 N.Y.S.2d at 357 (rejecting appellant's proposed reading of consent clause because "[a]ppellant's construction ignores . . . words that also must be given meaning"); Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 869 N.Y.S.2d 511, 516-17, 60 A.D.3d 61, 67 (1st Dep't 2008) ("In the instant case, the ordinary and natural meaning of the [contract's] words [is] dispositive . . . . A plain reading . . . makes clear that 10 years is the maximum term of the contract at issue . . . . We note that clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations.").[2]

II. Application to ¶ 1.1(a)(A)

Again, ¶ 1.1(a)(A) conveys to the plaintiff

> [t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks") . . . and all other Intellectual Property (as hereinafter defined).

Sale Agreement ¶ 1.1(a)(A) (underline in original). The parties each contend that the term "names" in ¶ 1.1(a)(A) means something

---

[2] The rule against surplusage is said to be a rule "of preference in interpretation," Restatement (Second) of Contracts § 203 (1981), which applies only after it is established that a term has more than one reasonable interpretation, see id. cmt. a. As the cited cases illustrate, however, New York courts nonetheless apply the rule in the inquiry whether a term is ambiguous.

8

different.  But the rules of interpretation applied by the New York courts support both parties' proposed meanings.  It is for this reason that I would conclude the term "names," as used in the Sale Agreement, is ambiguous.

A. JA Apparel's Proposed Meaning

1. Application of the Rules of Interpretation.  The plaintiff argues that the term "names" in ¶ 1.1(a)(A) denotes Joseph Abboud's personal name itself, not a mark related to his name.  As the district court concluded, application of the rule against surplusage makes this interpretation reasonable.  Pursuant to that rule, the term "names" must be given a meaning different from the meaning of the other properties listed by ¶ 1.1(a)(A); otherwise the term "would be superfluous."  S. Road Assocs., 4 N.Y.3d at 278, 826 N.E.2d at 809, 793 N.Y.S.2d at 838.  So the term must refer to intellectual property other than that which is subsequently referred to in the paragraph, i.e., other than a "trademark[]," for example, or a "trade name[]" or "service mark[]."  Sale Agreement ¶ 1.1(a)(A).[3]  From the ordinary usage of the term "name," it is reasonable to conclude that the other intellectual property in question is Abboud's personal name.  See The American Heritage Dictionary of the

---

[3]  Abboud is therefore wrong to assert that ¶ 1.1(a)(A) "do[es] not mention, manifest or express any intent to sell the exclusive right to use Abboud's name, other than as a trademark." Defs.' Br. 31.

English Language 1167 (4th ed. 2000) (defining "name" principally as "[a] word or words by which an entity is designated and distinguished from others").[4]

Reading the Sale Agreement as a whole supports this result. Paragraph 1.1(a)(C), quoted in full at the outset of

---

[4] It also seems to me that although the rule against surplusage is said to apply not only to contract provisions, see Corhill Corp., 9 N.Y.2d at 599, 176 N.E.2d at 38, 217 N.Y.S.2d at 3, but to particular words within a contract provision, see, e.g., Kass, 91 N.Y.2d at 568, 696 N.E.2d at 181, 673 N.Y.S.2d at 357, the rule should nonetheless be applied with a grain or two of salt when examining a list of words having similar or even overlapping meaning in a commercial agreement. Such an itemization of terms may reflect an intent to occupy a field of meaning, not to separate it into differentiated parts. Indeed, this is a common -- perhaps all-too-familiar -- technique used in drafting agreements, commercial and otherwise. With this technique, words are used more like the brush strokes of a house painter than of those of a portrait painter -- each intended principally to ensure that the surface is covered, not to convey a separate piece of information. See, e.g., Sale Agreement ¶ 1.1(a) (providing that "the Sellers shall sell, convey, transfer, assign, and deliver" the "right, title and interest in and to" the properties in question); In re Luxotica Group S.p.A. Sec. Litig., No. CV 01-3285 (JBW)(MDG), 2005 WL 3046686, *1, 2005 U.S. Dist. LEXIS 27765, *11 (E.D.N.Y. Nov. 15, 2005) (in the case of a specified event, "the Stipulation, including any amendment(s) thereof, . . . shall be null and void, of no further force or effect, and without prejudice to any party, and may not be introduced as evidence or referred to in any actions or proceedings by any person or entity, and each party shall be restored to his, her or its respective position as it existed prior to the execution of the Stipulation"); In re Host Am. Corp. Sec. Litig., No. 05-CV-1250 (VLB), 2008 U.S. Dist. LEXIS 94194, *17-*18 (D. Conn. Nov. 19, 2008) (similar) (not available on Westlaw). A "house painter" analysis of ¶ 1.1(a)(A) also supports JA Apparel's reading of "names" as meaning something different from "trademarks": listing all possible types of the mentioned intellectual property may be taken to signal an intention not to restrict the denotation of the listed terms to one type only.

10

this opinion, contains a list of intellectual property strikingly similar to that in ¶ 1.1(a)(A) but omits the term "names" with which the list in ¶ 1.1(a)(A) begins. See Sale Agreement ¶ 1.1(a)(C) (conveying "[a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing ['Joseph Abboud' and similar words]"). That "names" appears in one list but not the other suggests that the parties and their counsel took deliberate care to include the term in ¶ 1.1(a)(A) so as to convey an interest in something other than trademarks, trade names, and the like.

2. The Panel Majority's Analysis. The panel majority concludes that the term "names" is reasonably susceptible to JA Apparel's proposed interpretation because the term "is unadorned and . . . the name 'Joseph Abboud' is used many times in Schedule 1.1(a)(A)." Supra at 15. I find both reasons problematic.

To be sure, the term "names" in ¶ 1.1(a)(A) is "unadorned" in the sense that it has no modifiers. But that does not alone render either party's proposed meaning a reasonable one.

Schedule 1.1(a)(A), attached to the Sale Agreement and referred to in ¶ 1.1(a)(A), does not support JA Apparel's reading, because the name "Joseph Abboud," as a personal name, appears nowhere in the schedule. The schedule is a list of marks. The heading of each page reads: "Trademark Report by

11

Mark." The schedule lists categories of marks by name in bold-face capital letters, with each mark in the category set forth along with its registration information. So, while the schedule contains, among many other things, the words "Joseph Abboud," those words are mentioned only as a mark or a part of a mark, reflecting a trademark property related to "Joseph Abboud," not Joseph Abboud's personal name or whatever property right he may have in it.

B. Abboud's Proposed Meaning

1. Application of the Rules of Interpretation.

According to Abboud, the term "names" in ¶ 1.1(a)(A) denotes only trademarks or service marks and therefore does not convey rights to his personal name. The ordinary-meaning rule yields Abboud's interpretation. The interpretation flows not from the ordinary usage of the term "names," which, of course, can be used to refer to personal names and property interests in them, but from the appearance of the term in context: "[t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A)." Sale Agreement ¶ 1.1(a)(A) (underline omitted). Because, as noted, Schedule 1.1(a)(A) appears to identify only marks, not personal names, and the schedule "identifie[s]" what is conveyed by the Sale Agreement in ¶ 1.1(a)(A), it seems to me reasonable to conclude that what is conveyed by ¶ 1.1(a)(A) is only marks, and not the personal name of Joseph Abboud or his property rights in it. The text in

12

¶ 1.1(a)(A) therefore is reasonably susceptible to Abboud's proposed interpretation.

The rule against surplusage supports this reading. The phrase "Trademark Report by Mark," which is the page heading of the first five pages of Schedule 1.1(a)(A), must be given meaning. And if it is to mean nothing more than, as it says, a set of marks, then it cannot also mean personal names. If, departing from Abboud's interpretation, one does not restrict "names" and its surrounding terms to the property identified by Schedule 1.1(a)(A), and does not interpret that property to include only marks, one thereby "ignore[s] . . . words that . . . must be given meaning," Kass, 91 N.Y.2d at 568, 696 N.E.2d at 181, 673 N.Y.S.2d at 357, albeit words in a schedule and not the body of the agreement.[5]

This application of the ordinary-meaning rule and the rule against surplusage is bolstered by ¶ 3.6 of the contract, which states that "Schedule 1.1(a)(A) sets forth a list of all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by [Abboud] in connection with the Trademarks."

---

[5] Thus, the rule against surplusage counsels both in favor of interpreting the term "names" as denoting property other than the trademarks, service marks, and the other types of property listed in ¶ 1.1(a)(A) and in favor of interpreting the term as merely an instance of the more general category of trademark as set forth in Schedule 1.1(a)(A).

13

Sale Agreement ¶ 3.6 (underline omitted).  That list omits any mention of personal names.

2. The Panel Majority's Analysis.  The panel majority looks to Schedule 1.1(a)(A), as the text of ¶ 1.1(a)(A) instructs, and concludes that its listing "plainly did not exhaust Abboud's right to use his name in the future."  Supra at 16.  I agree.  But I am less certain about the panel's view that "brand names [i.e., marks] are similar to the items immediately following the word 'names' in [¶ 1.1(a)(A)], to wit 'trade names, service marks, logos[ and] insignias.'"  Supra at 15.  I think that the rule against surplusage requires the term "names" to have a meaning different from the words in that list.[6]

The panel majority also observes that the defined term "the 'Trademarks'" -- which collectively identifies property conveyed in ¶ 1.1(a)(A) -- "would seem to connote existing or pending uses."  Id.  But I would think that drafters define terms in contracts in order to avoid speculative meanings.  The term "the 'Trademarks,'" as defined, "connote[s]" nothing more than

_____

[6]  If the panel is suggesting that Abboud's proposed meaning is supported by application of the canon noscitur a sociis, pursuant to which "a word is given more precise content by the neighboring words with which it is associated," United States v. Williams, 128 S. Ct. 1830, 1839 (2008); see also Harris v. Allstate Ins. Co., 309 N.Y. 72, 76, 127 N.E.2d 816, 818 (1955) (applying canon), I disagree.  Even if the canon applies in the ambiguity inquiry, under the majority's reasoning it would stand for the proposition that the term "names" should denote "trademarks" and therefore have an identical denotation to the terms with which it appears.  I am aware of no such application of noscitur a sociis.

14

the set of terms it is defined to mean; it tells us nothing about how to interpret the terms that define it, including the term "names."[7]

Finally, the Court finds significance in the language of ¶ 1.1(a)(C), which conveys

> [a]ll rights to use and apply for the registration of <u>new</u> trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

Sale Agreement ¶ 1.1(a)(C) (emphasis added). I do not see how this text tells us whether Abboud transferred the rights to his personal name by including the term "names" in ¶ 1.1(a)(A). The term is absent from ¶ 1.1(a)(C). If ¶ 1.1(a)(A) did transfer to JA Apparel the right to use Abboud's personal name along with the listed trademarks, ¶ 1.1(a)(C) would still be necessary -- or at least advisable -- to ensure the transfer of the separate right to use and apply for "new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud' [and associated combinations]." The rights in question -- the right to use a personal name for commercial purposes and

---

[7] Schedule 1.1(a)(A) employs the terms "Trademark" and "Mark," but not the specially defined term "the 'Trademarks.'" Abboud's interpretation of the schedule is therefore unaffected by the defined term.

15

the right to apply for and use a new trademark containing the words of that name -- are different and independent.

It seems to me that if Joseph Abboud sold the right to use his personal name _as_ a personal name, the purchaser could open and run and advertise a clothing line called "Joseph Abboud Men." And if he already owned the mark "Joseph Abboud Men," and sold it, the purchaser would then have the right to use that term as a mark. But I do not think it necessarily follows from either hypothetical transaction that the purchaser could then have the exclusive right to apply for and use, as marks, _new_ trademarks made up of or derived from the words Joseph Abboud, e.g., "Joseph Abboud Women." Without an explicit sale of the right to apply for and use, as marks, new marks similar to or including his personal name, I should think both Abboud and the purchaser might each apply for such marks, and the rightful owner of that property would be determined by application of ordinary principles of trademark law.

For these reasons, the drafter's decision to cover the use of the name Joseph Abboud in the context of new trademarks in ¶ 1.1(a)(C) does not seem to me to indicate that the parties meant not to transfer the use of the name along with existing trademarks in ¶ 1.1(a)(A).

### D. The Ambiguity

In my view, the rules of interpretation do not conclusively establish the reasonableness of one party's

16

interpretation over the other in this case; they yield both interpretations as plausible results. And, as I have suggested, I think that both proposed resolutions do at least some violence to the rules of interpretation. The rules therefore leave us with an ambiguity that they are insufficient to resolve. I therefore agree with the panel majority that the district court should now consider whether extrinsic evidence will shed light on the matter, and if so, employ it to determine the meaning of the language in dispute.

III. Conclusion

For the foregoing reasons, I concur in the result reached by the panel majority.

17