**11-4055-cv**
**Olin Corp. v. Am. Home Assurance Co.**

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

--------------------------

August Term, 2012

(Argued: September 28, 2012          Decided: December 19, 2012)

Docket No. 11-4055-cv

--------------------------

OLIN CORPORATION,

*Plaintiff-Appellant*,

v.

AMERICAN HOME ASSURANCE COMPANY,

*Defendant-Appellee*,

OLIN-HUNT SPECIALTY PRODUCTS INC.,

*Third-Party-Defendant*,

ONEBEACON AMERICAN INSURANCE COMPANY, referred to in this litigation as COMMERCIAL UNION INSURANCE COMPANY,

*Cross-Defendant*,

INSURANCE COMPANY OF NORTH AMERICA, HANOVER INSURANCE COMPANY, as successor to MASSACHUSETTS BONDING AND INSURANCE COMPANY, AMERICAN RE-INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYDS LONDON AND LONDON MARKET INSURANCE COMPANIES, LONDON MARKET INSURANCE COMPANIES, COMMERCIAL UNION INSURANCE COMPANY, as successor to EMPLOYERS LIABILITY ASSURANCE CORPORATION LTD. AND EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY AMERICA, CONTINENTAL CASUALTY COMPANY, EMPLOYERS INSURANCE OF WAUSAU, C.E. HEALTH COMPENSATION & LIABILITY INSURANCE CO., as successor to FALCON INSURANCE COMPANY, successor to EMPLOYERS SURPLUS LINES INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE

COMPANY, GREAT AMERICAN INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, LONDON & EDINBURGH INSURANCE COMPANY LIMITED, CAPITAL MARKETS ASSURANCE CORP., as successor to NATIONAL AMERICAN INSURANCE COMPANY OF NEW YORK, successor to STUYVESANT INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, NORTH RIVER INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY A/S/O MARCO DEL GADO, as successor to NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU, ONEBEACON AMERICA INSURANCE COMPANY, formerly referred to in this litigation as COMMERCIAL UNION INSURANCE COMPANY, AETNA CASUALTY & SURETY COMPANY, GENERAL REINSURANCE CORPORATION, GOVERNMENT EMPLOYEES INSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, HOME INSURANCE COMPANY, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, INTEGRITY INSURANCE COMPANY, GREENWICH INSURANCE COMPANY, as successor to HARBOR INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, TRANSIT CASUALTY COMPANY, AIU INSURANCE COMPANY, CONTINENTAL CORPORATION, GOVERNMENT EMPLOYEES INSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, HARBOR INSURANCE COMPANY, NATIONAL AMERICAN INSURANCE COMPANY OF CALIFORNIA, as successor to STUYVESANT INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, NEW YORK PROPERTY/CASUALTY INSURANCE SECURITY FUND, CENTURY INDEMNITY COMPANY, as successor to INSURANCE COMPANY OF NORTH AMERICA,

*Defendants*.

-------------------------

Before:

      CHIN, LOHIER, and DRONEY, *Circuit Judges*.

-------------------------

Appeal from an order of the United States District Court for the Southern District of New York (Griesa, *J.*) granting summary judgment to American Home Assurance Company ("American Home") on the ground that the attachment point for its excess insurance policies could not be reached by the alleged environmental damage at Olin Corporation's ("Olin") site at Morgan Hill, California. We hold that the plain language of Olin's policies with American Home requires American Home to indemnify Olin for that damage. Accordingly, the judgment of the district court is VACATED and the case is REMANDED for further proceedings.

-------------------------

CRAIG C. MARTIN, Jenner & Block LLP, Chicago, IL, *for* Plaintiff-Appellant.

MICHAEL H. COHEN, Saiber LLC, Florham Park, NJ, *for* Defendant-Appellee.

Mary Beth Forshaw, Bryce L. Friedman, Simpson Thacher & Bartlett LLP, New York, NY, *for OneBeacon American Insurance Company as* amicus curiae *in support of Defendant-Appellee*.

------------------------

DRONEY, *Circuit Judge*:

Plaintiff-Appellant Olin Corporation ("Olin") appeals from a grant of summary judgment in favor of Defendant-Appellee American Home Assurance Company ("American Home") in the United States District Court for the Southern District of New York (Griesa, *J*.). Olin brought this action against its insurers, including American Home, regarding environmental contamination at Olin sites in the United States. This appeal arises from proceedings related to Olin's Morgan Hill, California, manufacturing site. At issue is whether the $30.3 million attachment point for American Home's excess policies for the years 1966-69 and 1969-72 could be reached by the alleged property damage at Morgan Hill.

For the reasons that follow, we vacate and remand.

## BACKGROUND

This case began in 1984 when Olin brought a diversity action against its insurers seeking indemnification for environmental damage at Olin manufacturing sites throughout the United States.[1] Because each site raised its own factual and legal issues, the district court has addressed

---

[1]This action was originally filed in United States District Court for the District of Columbia but was transferred to the Southern District of New York.

coverage on a site-by-site basis. This appeal arises out of the most recent of these site-specific proceedings, concerning contamination at Olin's manufacturing site at Morgan Hill, California, between 1957 and 1987. In the course of this proceeding, the district court granted summary judgment to American Home, which issued two excess policies during this period, on the ground that the attachment point for these excess policies could not be met. That ruling is the basis of the present appeal.

**I.      Olin's Morgan Hill Site**

Olin began manufacturing signal flares at Morgan Hill, California, in 1956.[2] Olin used the chemical potassium perchlorate ("perchlorate") in the manufacturing process. As part of this process, perchlorate was combined with other chemicals by various means including the use of cement mixers. This produced a large volume of perchlorate dust, which was dispersed throughout the site by wind and foot traffic. Perchlorate powder on the ground was then dissolved by rainfall and carried via run-off into dry wells at the site, where it seeped into the ground, contaminating the water table below the site. Changes in Olin's manufacturing process in the 1970s decreased the volume of perchlorate spilled, but regular spillage appears to have continued in some quantity until at least 1986.

Throughout this period, the concentration of perchlorate in the water table below the site increased, generating an underground plume of perchlorate that gradually spread down the valley. This underground plume reached equilibrium in 1987, meaning that the contamination of additional soil or groundwater ceased. By then, the plume extended approximately ten miles

---

[2]For the purposes of summary judgment, the excess insurers assumed as true the facts presented by Olin's expert witness, William L. Hall, because the insurers believed they were entitled to summary judgment even on that basis. We will follow the district court in assuming those facts are accurate for the sake of deciding the present appeal.

from the site. Olin estimated that it would incur costs of more than $102 million to fully remedy the damage caused by the underground perchlorate plume.[3]

**II.     The American Home Policies**

Olin had an insurance program consisting of general commercial liability insurance and layered excess policies. Two excess policies provided by American Home are at issue here: policy number CE351099 and policy number CE355541.[4] The first of these covers the period of January 1, 1966, to January 1, 1969. The second covers the period of January 1, 1969, to January 1, 1972. Each policy covers ten percent of up to $10 million in damages in excess of $30.3 million for the three-year policy period.[5] Thus American Home has no coverage obligation unless the damages attributable to one of the policies exceed this $30.3 million attachment point.[6] Each policy also "follows form" to lower-level excess policies, which means that it adopts their terms and conditions.

The 1969-72 American Home policy follows form to a policy issued by Underwriters at Lloyd's ("Lloyd's"). According to the terms of the Lloyd's policy, American Home is obligated

---

[3]These costs include $50 million Olin has spent to remedy contamination ordered by the California Regional Water Quality Control Board, $47 million it will spend in the future on such remediation, and $5.3 million in costs associated with a suit filed by the Santa Clara Valley Water District.

[4]Olin originally sought indemnification under a third American Home policy, CE245707. Olin no longer appears to be pursuing this policy, however, and it is not before us.

[5]The maximum payout on each policy is therefore $1 million.

[6]Olin's general commercial liability policy for the relevant periods had a maximum liability of $300,000. Damages that exceeded this threshold would be covered by the first excess policy. Damages exceeding the liability limit of that first excess policy would implicate the next excess policy, and so on. The American Home policies would be required to indemnify Olin only if a loss exceeded the liability limits of the lower-level policies, which here would require $30.3 million in damages.

to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability . . . imposed upon the Assured by law . . . for damages, direct or consequential and expenses . . . on account of . . . Property Damage . . . caused by or arising out of each occurrence happening anywhere in the World.

The Lloyd's policy defines "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured)." The policy defines "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, property damage or advertising liability during the policy period" and further specifies that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

The Lloyd's policy also contains a Condition C: "Prior Insurance and Non-Cumulation of Liability." This provision, the principal subject of this appeal, states the following:

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Subject to the foregoing paragraph and to all the other terms and conditions of this Policy, in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy, Underwriters will continue to protect the Assured for Liability in respect of such personal injury or property damage without payment of additional premium.

The 1966-69 American Home policy follows form to a policy issued by the Home Insurance Company, which in turn mostly follows form to a policy issued by Lloyd's. That Lloyd's policy appears to be identical to the policy underlying the 1969-72 American Home policy in nearly all relevant respects, employing the same definitions of "occurrence" and "property damage" and including an identical Condition C. The difference between the two

6

American Home policies is that the Home Insurance Company policy underlying the 1966-69 American Home policy specifies that it only provides coverage for "accidents or occurrences . . . taking place during the period of the Policy." No such language applies to the 1969-72 American Home policy.[7]

**III.    Proceedings Related to the Morgan Hill Site**

On June 14, 2010, Olin filed a third amended complaint seeking indemnity related to the Morgan Hill site. Olin sought coverage from American Home under its policies. American Home moved for summary judgment, arguing that the $30.3 million attachment point was not reached for either policy. American Home relied on our decision in *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307 (2d Cir. 2000) ("*Olin I*"), discussed further below, which provides for pro rata allocation of damage in cases of progressive environmental injury. Under this approach, the total $102 million in damages from the cleanup of the Morgan Hill site should be equally divided among the years in which property damage occurred. And under our decision in *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120 (2d Cir. 2006) ("*Olin II*"), also discussed further below, property damage occurred from the time when contamination began until the time when the underground plume of perchlorate reached its maximum extent. Assuming that contamination began in 1957 and the plume reached equilibrium in 1987, property damage occurred in thirty-one years. Pursuant to *Olin I* and *Olin II*, the total damage of $102 million should be divided by 31, yielding a per-year damage figure of $3.3 million. Since each American

----

[7]The parties therefore agree that under the 1966-69 policy, an occurrence is only covered if damage and the event causing the damage take place within the policy period. Olin argues that under the 1969-72 policy, only the damage from an event need take place within the policy period in order to be a covered occurrence; the event causing the damage need not. For the reasons stated below, this difference in language does not affect our resolution of this appeal.

Home policy had a coverage period of three years, the total property damage attributable to each policy from the perchlorate spill amounted to only $9.9 million. Thus neither policy's attachment point of $30.3 million could be reached.

Olin did not dispute this basic analysis but argued that American Home had ignored the effect of Condition C on the policies. In Olin's view, the second paragraph of Condition C requires American Home to indemnify Olin not only for damage occurring during the policy periods but also for any damage in subsequent years. This is because property damage arising from a "covered occurrence" was "continuing at the time of termination" of each policy, and thus American Home's liability for the 1966-69 policy includes all damage from 1966 to 1987, and its liability for the 1969-72 policy includes all damage from 1969 to 1987. Using the pro rata approach of *Olin I*, $72.6 million in damage should be assigned to the 1966-69 policy, and $62.7 million should be assigned to the 1969-72 policy. Since these amounts far exceed the $30.3 million attachment point, each policy would be reached.

The district court rendered an oral decision regarding the effect of Condition C, and based on this decision it later granted American Home's motion for summary judgment on Olin's claims. We interpret the district court's decision as turning on the definition of "occurrence." In the district court's view, Condition C covers only damage resulting from an occurrence that takes place within the policy period. The district court appears to have concluded that the actual spilling of perchlorate on the ground was the occurrence here, with each spill of the chemical being a separate occurrence. On this basis, Condition C would only implicate American Home's 1966-69 policy if the perchlorate spilled between 1966 and 1969 caused more than $30.3 million of the $102 million total damage, with the same being true for the 1969-72 policy regarding spills from 1969 to 1972. The district court thus granted American Home's

8

motion because Olin had failed to raise a triable issue of material fact regarding whether the spills of perchlorate from 1966 to 1969 or 1969 to 1972 were sufficient to cause $30.3 million in damage. On September 20, 2011, the district court entered final judgment under Rule 54(b) of the Federal Rules of Civil Procedure in favor of American Home. Olin proceeded to trial against the remaining insurers implicated in the Morgan Hill site and settled with the other excess insurers prior to a verdict.[8] Olin timely appealed the district court's dismissal of its claims against American Home.

**DISCUSSION**

We review *de novo* a district court's grant of summary judgment. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010). Summary judgment may be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, a court should "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**I.      This Court's Prior *Olin* Decisions**

Two of our decisions involving other Olin sites are central to the issues of this case. *Olin I*, 221 F.3d 307, involved the allocation of damages related to an Olin fertilizer plant in Williamston, North Carolina. Olin produced pesticides at that site from 1950 to 1967. *Id.* at 311-12. Nearly two decades later, substantial contamination of the soil and groundwater of the site was discovered, requiring Olin to incur more than $4 million in cleanup costs. *Id.* at 313. At trial,

---

[8]Amicus OneBeacon American Insurance Company ("OneBeacon"), whose interest in this case is discussed further below, was one of the excess insurers that settled with Olin regarding Olin's Morgan Hill site.

the jury found injury to property at the Williamston site from 1951 through 1985, raising the issue of how the total damages should be allocated under New York law to the various insurance policies in effect during this thirty-five year period. Olin argued for the joint and several approach, in which Olin could select a particular year during the period of damage, collect damages up to the policy limits from the policies in effect that year, and the selected insurers could then seek contribution from other policies in effect during other years of the loss period. *Id.* at 322. The insurers argued that liability should be allocated among the policies according to "some objective factor." *Id.* Finding the language of the policies "inconclusive" on this question, we turned to public policy and equitable considerations and found these to "clearly indicate allocation" as the correct methodology. *Id.* at 324. Because the evidence in the case provided no basis on which to allocate liability for damages to any particular year or period, we affirmed the district court's decision to allocate damages equally to each year in which the jury found damage had occurred. *Id.* at 325, 327. The New York Court of Appeals subsequently confirmed our prediction of New York law on this point, holding that in the absence of contractual language to the contrary, courts should use the pro rata approach to allocating liability for damages in cases of progressive environmental injury under these circumstances. *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 695 (N.Y. 2002).

Our second decision is *Olin II*, 468 F.3d 120. That case involved four Olin sites near Niagara Falls, New York. *Id.* at 123. As in the present case, chemical spills at these sites contaminated the soil, and subsequent groundwater flows spread this contamination. The contamination was not discovered for decades. When it was discovered, Olin incurred substantial

cleanup costs, which it sought to recover from some of the very same policies involved here.[9]

We began by reaffirming our holding in *Olin I* that in cases when "continuous property damage takes place over a number of policy periods, the liability for that injury is allocated over the time during which property damage occurred." *Id.* at 126. We also clarified that equally allocating damage pro rata is a default rule; if the evidence allows for more specific assignment of liability to particular years, then responsibility should be determined in that way. *Id.* at 127. The primary issue of *Olin II*, however, concerned the definition of "property damage." Given that *Olin I* requires damage to be allocated equally among all years in which property damage occurred, the question of *Olin II* was whether "property damage" occurred only in those years in which "active pollution" took place–that is, "the placing of pollutants at a source where they will leach into the environment"–or whether property damage also occurred in those years when groundwater spread already spilled pollutants into new areas. *Id.* at 129. Because the insurance contracts did not adequately define "property damage," we held that New York courts would likely conclude that "property damage occurs as long as contamination continues to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater." *Id.* at 131.

The effect of these two decisions on the instant case is clear. Under *Olin I*, in the absence of contractual provisions to the contrary or evidence indicating that ascertainable amounts of damage occurred in certain years, the $102 million in property damage in this case should be

---

[9]The 1966-69 American Home policy follows form to a Home Insurance policy that follows form to one of the Lloyd's policies against which Olin sought recovery in *Olin II*. This Lloyd's policy is the ultimate source of Condition C in the 1966-69 American Home policy. The Lloyd's policy underlying the 1969-72 American Home policy is identical in all relevant respects to the Lloyd's policy implicated in *Olin II*.

11

allocated equally to each year in which the property damage occurred. And under *Olin II*, property damage occurred from the time when perchlorate contamination first began until the time when this contamination reached its maximum extent through the spread of the underground plume in the water table.[10] Here, the parties assumed for the purposes of summary judgment that contamination began in 1957 and that the plume reached equilibrium in 1987. Thus under *Olin II*, "property damage" occurred in those 31 years. Dividing the total damage of $102 million by the 31 years in which damage occurred, $3.3 million in damage should be allocated to each year between 1957 to 1987.[11] This, however, does not resolve the principal issue of this appeal. *Olin I* and *Olin II* were based, in part, on the specific language of the insurance contracts at issue there. Olin contends that Condition C in the two policies here obligates American Home to indemnify it not only for the damage occurring within the three years of each policy, but also for damage that continued after the policies had terminated until the plume reached equilibrium in 1987.

## II.    Law of the Case, Estoppel, and Waiver

Before considering the effect of Condition C, we first must decide whether Olin is permitted to raise it as a basis for indemnification. American Home argues that the law of the case doctrine prevents Olin from making its Condition C argument because we previously decided how liability for damage for progressive environmental injury should be allocated across

---

[10]Because the insurance contracts in *Olin II* employed the same definition of "property damage" as the contracts here, we see no reason why the spread of the plume of perchlorate should not be deemed "property damage" under the American Home policies.

[11]This, of course, is merely the result of the record relied upon by the district court in granting summary judgment and not a factual finding regarding the actual damage.

multiple policies in *Olin I* and *Olin II*, and Condition C was present in some of those policies.[12]
At oral argument, however, counsel for American Home conceded that the interpretation of Condition C was never raised or decided in those cases before either this Court or the district court. As such, the law of the case doctrine is no bar to considering Olin's Condition C arguments. *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 44-45 (2d Cir. 2005).

Amicus OneBeacon[13] argues that Olin is collaterally estopped from raising Condition C, but this argument is also unavailing. Collateral estoppel only prevents relitigation in a subsequent action of "an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action." *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (internal quotation marks and emphasis omitted). Because the meaning of Condition C was not "actually litigated and decided" in our previous opinions, collateral estoppel does not apply.

The estoppel claim raised by American Home and OneBeacon could also be framed as a waiver issue. However, the district court expressly found that Olin had not waived its argument regarding Condition C by failing to raise it earlier, because the effect of Condition C was not an

---

[12]As mentioned above, *Olin II* involved, among others, the same Lloyd's policy whose form the 1966-69 American Home policy follows.

[13]OneBeacon issued at least nine high-level excess policies to Olin. Olin sought to recover from some of these policies for the damage at Morgan Hill. The district court dismissed some of Olin's claims against OneBeacon when it granted summary judgment to American Home. Olin and OneBeacon settled the remaining claims before trial. In its notice of appeal, Olin designated only American Home and itself as the parties to this appeal. Thus OneBeacon is not an appellee in the present action. However, some of OneBeacon's policies follow form to the same policies underlying the American Home policies. As a result, they contain Condition C. This means that our interpretation of Condition C may affect OneBeacon's liability to Olin regarding other Olin sites. Because of this, OneBeacon moved to amend the caption to include it as an appellee and, in the alternative, for leave to file an amicus brief. On April 3, 2012, we denied OneBeacon's motion to amend the caption but granted its motion to file an amicus brief.

13

issue in earlier proceedings involving other Olin sites. A district court's determination that a party has not waived an argument by raising it earlier is reviewed for abuse of discretion. *Saybolt Int'l*, 407 F.3d at 45. Neither American Home nor OneBeacon has shown that the district court abused its discretion in finding no waiver. *See id.* At 45-46. For these reasons, we see no merit to the contention that we are unable to consider the proper interpretation of Condition C, and we now turn to that question.

**III.     Relevant Principles of New York Contract Interpretation**

Under New York law,[14] insurance policies are interpreted according to general rules of contract interpretation. *E.g.*, *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 183-84 (2d Cir. 2003), *abrogated on other grounds*, *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006). Two of these rules are particularly relevant here. First, the "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and ellipsis omitted). Any interpretation of a contract that "has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Id.* (citation omitted).

Second, contract terms are ambiguous if they are

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996) (citation omitted). If a court concludes a provision in an insurance contract is ambiguous, it may consider

---

[14]The parties agree that New York law applies.

extrinsic evidence to ascertain the parties' intent at the formation of the contract. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the insured. *See Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 697-98 (2d Cir. 1998). Ambiguity is absent where the contract's language provides "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (internal quotation marks and alteration omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Id.* An unambiguous provision of the contract should be given its "plain and ordinary meaning" and the contract should be construed without reference to extrinsic evidence. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). With these principles in mind, we turn to Condition C.

**IV.  Condition C**

Condition C, the full text of which is quoted above, appears in both of the relevant American Home policies through their following form with the underlying Lloyd's policies.[15] It consists of two paragraphs. We will refer to the first paragraph of Condition C as the "prior

---

[15]Condition C was apparently written by Lloyd's underwriters in 1960 when Lloyd's adopted an "occurrence"-based form in place of an "accident"-based form. The provision's purpose was to "thwart" policyholders from attempting to obtain double recovery when the triggering event occurred while an accident-based policy was in effect but the injury did not manifest until an occurrence-based policy was in effect. *See* Christopher C. French, *The "Non-Cumulation Clause": An "Other Insurance" Clause by Another Name*, 60 U. Kan. L. Rev. 375, 386-87 (2011).

15

insurance provision" and the second as the "continuing coverage provision." It is the application of this second provision that is the primary issue here. It provides:

> Subject to the [prior insurance provision] and to all the other terms and conditions of this Policy, in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy, Underwriters will continue to protect the Assured for Liability in respect of such personal injury or property damage without payment of additional premium.

By virtue of its plain language, we see three requirements for the application of the continuing coverage provision. First, there must be "personal injury or property damage." Second, this personal injury or property damage must "aris[e] out of an occurrence covered" by the policy. And third, this personal injury or property damage must be "continuing at the time of termination" of the policy. When these three conditions are met, the plain language of the provision requires the insurer to indemnify the insured for personal injury or property damage continuing after the termination of the policy. We conclude that all three of these conditions are met.

First, "property damage" occurred during both the 1966-69 and the 1969-72 coverage periods. This conclusion follows from *Olin II*, which held that the spread of earlier contamination met the definition of property damage in the same policies at issue here. The parties have assumed for the purpose of summary judgment that the perchlorate plume began in 1957 and reached equilibrium in 1987. No evidence was presented suggesting that the plume did not expand between 1966 and 1972. Thus we presume that the plume was spreading during this period, causing property damage. The parties agree on this point.

Second, this property damage arose out of an occurrence covered by both the 1966-69 and the 1969-72 policies. The policies define an "occurrence" as "an accident or a happening or

16

event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury, property damage or advertising liability *during the policy period*" and specifies that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence" (emphasis added).[16] Olin argues that based on this language, the continuous absorption of perchlorate into the soil and groundwater from 1956 to 1987 is a single, multi-year occurrence. That absorption was a continuous or repeated exposure to conditions that resulted in property damage. And because both the absorption itself and the property damage caused by it took place *during the policy period* of both the 1966-69 and 1969-72 policies, it is a covered occurrence for the purposes of each policy.[17] This accords with the plain language of the policy. It also is the correct application

---

[16]It may seem that the continuing coverage provision has only two, not three requirements: a "covered occurrence" and continuing damage. This is so because an event is an "occurrence" only if it causes damage during the policy period, and thus it appears that any event meeting the definition of an "occurrence" will also meet the first requirement of the continuing coverage provision: that there be personal injury or property damage during the policy period. This interpretation, however, ignores an important difference in the language of the policies. An event is also an "occurrence" if it causes *advertising liability* during the policy period. But the continuing coverage provision covers only *personal injury* or *property damage* that begins during the policy and continues after its termination. Thus there is no continuing coverage for advertising liability by the plain terms of the continuing coverage provision. The fact that not all injuries covered by the policy are covered by the continuing coverage provision provides an additional reason why we cannot treat this provision as redundant or superfluous.

[17]Olin argues that the 1966-69 policy requires that both the property damage and the happening or event causing the damage take place within the policy period in order to meet the definition of an "occurrence," while the 1969-72 policy only requires that the property damage take place within the period. We need not consider this issue, however, because the evidence shows that both the property damage and the event that caused it (namely the exposure of the soil and groundwater to perchlorate) took place (in part) during each policy period, and thus a covered occurrence took place for the purposes of each policy.

17

of New York law. *Cf. Appalachian Ins. Co. v. Gen. Elec. Co.*, 863 N.E.2d 994, 1000-01 & n.3 (N.Y. 2007); *Ramirez v. Allstate Ins. Co.*, 811 N.Y.S.2d 19, 20 (1st Dep't 2006).

American Home agrees that the perchlorate contamination at Morgan Hill qualifies as a single, multi-year occurrence "for purposes of determining applicability limits of liability and retentions." However, American Home argues that a single, multi-year occurrence spanning the policy period does not satisfy Condition C. We see no basis in the language of the policy for concluding that "occurrence" in Condition C has a different meaning than "occurrence" elsewhere in the policies. Indeed, the policies rule out such an interpretation by expressly stating that "occurrence" shall have the meaning provided by the policy "wherever used herein." Thus, if, as American Home concedes, thirty years of constant perchlorate exposure on the same site that through the same process caused property damage by the slow expansion of the plume satisfies the definition of "occurrence" for the purposes of applying other provisions of the policy, it suffices for Condition C. The second requirement of Condition C is therefore met because the property damage discussed above "arose out of" an "occurrence" covered by the policy.

The third requirement of Condition C is also met here: the property damage occurring during the policy period was clearly "continuing" at the time of termination of each policy. For the purposes of summary judgment, the parties assumed that the property damage–namely, the spread of the perchlorate plume–began in 1957 and continued until 1987. No evidence was presented that this damage was not "continuing" in 1969 when the first policy expired or that it did not continue until 1987. The same is true for the 1969-72 policy.

18

American Home and amicus OneBeacon argue, however, that the post-policy damage was "new" damage rather than "continuing" damage. Under this view, any additional damage occurring after the policy period is "new" and thus damage "continuing at the time of termination" of the policy means only prior damage that has not been fully remedied when the policy terminates. However, this interpretation deprives Condition C of any effect, since even without Condition C American Home would be obligated to indemnify Olin for damage occurring during the policy period that had not yet been remedied. *See LaSalle Bank*, 424 F.3d at 206 (stating that contracts "should be construed so as to give full meaning and effect to all [their] provisions" (internal quotation marks omitted)). We conclude instead that damage "continuing at the time of termination" of the policy clearly contemplates property damage from the migration of chemicals in the expanding groundwater plume during the term of the policy and continuing after the policy terminated. This is consistent with *Olin II*, which characterizes such damage as both "additional" and "continuing." *See Olin II*, 468 F.3d at 129-30.

Because the three requirements of Condition C are met, that provision applies here. American Home thereby could be obligated to indemnify Olin up to the limits of its policies for all property damage caused by the perchlorate plume that occurred during and after the termination of each policy. Since there is not yet any basis for attributing greater or lesser damage to individual years, we follow the district court in allocating $3.3 million of damage to each year between 1957 and 1987. The 1966-69 policy is thus exposed to twenty-two years of damage, a total of $72.6 million. The 1969-72 policy is exposed to nineteen years of damage, a total of $62.7 million. Because each of these figures exceeds the $30.3 million attachment point, summary judgment was inappropriate.

19

American Home's main argument against applying the plain language of the continuing coverage provision of Condition C is that this result would be contrary to the pro rata allocation rule applied in *Olin I* and *Olin II*. However, those decisions simply provide that when insurance contracts do not adequately define how progressive environmental damage is to be apportioned across multiple triggered policies, and the evidence cannot make that distinction, New York law requires damage to be allocated pro rata. New York law does not preclude parties from contracting to indemnify the insured for damage allocated to years after the termination of the policy. This is precisely what American Home's policies do here with Condition C. American Home has agreed to indemnify Olin not only for damage taking place during the policy period but also continuing after the termination of the policy. The provision thus simply adds additional years of exposure, using the same pro rata allocation method for determining the amount of damage attributed to each year.

Some state courts in other jurisdictions interpreting policies containing Condition C have concluded that the language of those policies is "inconsistent" with the pro rata approach and have imposed joint and several liability among triggered policies in cases involving so-called long-tail liability. *See, e.g., Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 493-94 (Del. 2001); *Chi. Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London*, 797 N.E.2d 434, 441-44 (Mass. App. Ct. 2003); *Dow Corning Corp. v. Cont'l Cas. Co.*, No. 200143, 1999 WL 33435067, at *6-7 (Mich. Ct. App. Oct. 12, 1999) (per curiam) (unpublished opinion). American Home argues that these decisions support its view that the interpretation of Condition C we adopt here is inconsistent with our pro rata decisions in *Olin I* and *Olin II*. We agree with American Home that New York state court decisions and those prior decisions of this Court endorsing the pro rata approach foreclose us from interpreting Condition C as imposing joint and several liability.

20

However, the decisions from other jurisdictions endorsing joint and several liability did not principally rely on Condition C to reach that outcome. Instead, those decisions relied on language in the policies providing coverage for "all sums which the Assured shall be obligated to pay." *See, e.g.*, *Hercules*, 784 A.2d at 489-90, 493-94. This same "all sums" language appears in the American Home policies, but both this Court in *Olin I* and the New York Court of Appeals in *Consolidated Edison* have expressly rejected the conclusion that such language requires joint and several allocation of damages and instead have endorsed the pro rata allocation method for policies with that language. *See Olin I*, 221 F.3d at 323-24; *Consol. Edison*, 774 N.E.2d at 695. Thus the only difference in language between the American Home policies here and the provisions of the policies considered by the *Olin I* and *Consolidated Edison* courts is Condition C.[18] That is not enough to impose joint and several liability and reject pro rata allocation, given that the continuing coverage provision of Condition C applies only to damages continuing *after* the termination of the policy and is silent regarding damages occurring *before* the policy period. Thus Condition C alone cannot trigger joint and several liability lin lieu of the pro rata allocation methodology employed in *Olin I* and *Consolidated Edison*.

Our prior holdings regarding pro rata allocation and those of the New York state courts call for us to endorse the pro rata allocation method and allocate $3.3 million in damage to each year from 1957 to 1987. But the plain language of the continuing coverage provision of Condition C extends liability *temporally* by providing that the insurer will cover damage allocated pro rata to years after the termination of the policy if that damage (1) is "continuing" at

[18]These cases, particularly *Consolidated Edison*, concerned damage over extended periods of time. It may be that some of the policies implicated in these cases did in fact contain Condition C, but if so, the parties never raised it and those decisions did not discuss it.

21

the time of the policy's termination and (2) arises from an occurrence covered by the policy.

Thus the continuing coverage provision of the 1966-69 policy applies to all damage allocated to the years 1966 until the time when property damage ceases (here 1987). The same is true of the 1969-72 policy for the period of 1969-1987. We believe that this interpretation best harmonizes the plain language of Condition C with the holdings of our Court involving similar policies.[19] We also believe this honors the intent of the parties, because declining to enforce the continuing coverage provision of Condition C while allocating damages pro rata may excuse high-level excess insurers from providing coverage paid for by their insureds. Allocating damages over a lengthy period typically results in attachment points for certain excess policies not being reached. Giving effect to the plain language of Condition C thus allows insureds to look to excess policies for some indemnification when those policies include Condition C.

American Home argues that this interpretation of Condition C would produce a result inconsistent with the other terms of the policies. Specifically, the 1966-69 policy (with the application of Condition C) covers property damage from the perchlorate plume for the period of 1966 to 1987. This would be anomalous, it is argued, because perchlorate continued to be spilled at the site into the mid-1980s. Thus under the 1966-69 policy, Olin could potentially recover for property damage occurring in 1985 that was contributed to by chemicals spilled in 1982, making American Home liable for the release of chemicals that occurred long after the policy had terminated. However, this result follows not from our interpretation of whether the damage is

---

[19]Because Condition C is unambiguous, we do not consider extrinsic evidence in interpreting the provision, *see Alexander*, 136 F.3d at 86, nor do we apply the rule of *contra proferentem*. We observe, however, that if the meaning of Condition C *were* unclear and the extrinsic evidence did not resolve the ambiguity, we would be required to construe the provision against the insurer.

"continuing" but rather from the fact that the American Home policies define the constant, three-decade-long exposure of the soil and groundwater to perchlorate dust as one, multi-year occurrence, as well as from the holding of *Olin II* that the spread of the perchlorate plume is property damage.

We now turn to the final issue: how the "prior insurance" provision of Condition C applies to the two American Home policies. American Home contends that this provision prevents it from having any responsibility under either policy, because the damage caused by the perchlorate spill is covered "in whole or in part" by Olin's other policies, namely policies that provided coverage before the dates of the American Home policies. Olin has already recovered from some of these policies, but at levels below the American Home policies' attachment point. Olin argues that American Home misreads the prior insurance provision, which applies only to policies that are (1) provided by the same insurer (2) at the same level of coverage. Since Olin had no coverage at the $30.3 million level provided by American Home before the 1966-69 American Home policy, these conditions are not met. But Olin concedes that the prior insurance provision of Condition C does apply to the 1969-72 American Home policy, because the 1966-69 policy meets these two conditions. Olin therefore argues that the most it can recover from the two policies is $1 million, since Olin's recovery from the 1969-72 policy is reduced by the amount it recovers from the 1966-69 policy via the operation of the prior insurance provision.

We agree with Olin that the prior insurance provision does not apply to prior insurance policies at a lower level of excess coverage. An excess insurance policy, such as the American Home policies here, is not triggered unless the coverage limits of lower-level policies have first been exhausted. Reducing American Home's liability on an excess policy at the $30.3 million level because of damages paid by a policy, for example, at the $20 million level would conflict

23

with the terms of the higher-level excess policy, since the intent of purchasing insurance at the $30.3 million level is to be indemnified only when lower-level policies are unable to fully indemnify a particular loss and the total damages reach that higher-level policy's attachment point. American Home's $30.3 million excess policy insures against a different loss than an excess policy at the $20 million level: a loss in excess of $30.3 million. Thus we conclude that the prior insurance provision reduces American Home's liability only to the extent that a prior insurance policy at the same level of coverage, here $30.3 million, indemnifies for a loss that is also covered by an American Home policy. This accords with Condition C's apparent purpose of sweeping a continuing loss into the earliest triggered policy, with that policy then fully indemnifying the insured for that loss.[20] As a result, only one of the American Home policies here indemnifies Olin.

Based on this interpretation of the prior insurance provision, the most Olin can recover from the two American Home policies is the policy limit of one policy, $1 million. The record before the district court established that Olin did not have any insurance at the $30.3 million level until the 1966-69 policy. Because no prior policy exists from which Olin could recover damages in excess of $30.3 million, Olin's recovery from the 1966-69 policy cannot be reduced

---

[20]We acknowledge that courts typically do not enforce the similar "other insurance" provision in pro rata jurisdictions, because enforcing it gives insurers a "double credit": the pro rata methodology allocates only a portion of the total loss to each insurer, but enforcing an "other insurance" provision would then allow insurers to reduce their liability for their portion of the loss to the extent another insurer pays damages for that insurer's portion of the loss. *See, e.g.*, *Spaulding Composites Co. v. Aetna Cas. & Sur. Co.*, 819 A.2d 410, 422 (N.J. 2003); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 670 N.E.2d 740, 750 (Ill. App. Ct. 1996). This rule is not applicable here, however, because the continuing coverage provision is expressly limited by the prior insurance provision. Thus, to the extent the continuing coverage provision expands an insurer's liability, it does so subject to the limitations of the prior insurance provision. We therefore cannot give effect to the continuing coverage provision while disregarding the prior insurance provision, but we instead must give effect to both parts of Condition C.

24

by its recovery under any other policy.[21] Since the 1966-69 policy is at the same $30.3 million level as the 1969-72 policy, though, any amount Olin recovers from the former reduces its recovery under the latter according to the terms of the prior insurance provision.

**V.      Proceedings on Remand**

For the reasons stated above, we conclude that the district court's basis for granting summary judgment was in error. Condition C obligates American Home to indemnify Olin not only for property damage occurring during the policy period, but also for property damage arising from covered occurrences that continues after the policy period. Three decades of perchlorate exposure and the damage it created are treated as a single, multi-year occurrence for the purposes of this policy. And because this single, multi-year occurrence took place in part during each of the two policy periods here, the district court was incorrect to conclude that neither policy would be reached because of the allocation method. On the record before the district court, $72.6 million in damage falls within the coverage of the 1966-69 policy, while $62.7 million falls within the coverage of the 1969-72 policy. These figures exceed the American Home policies' $30.3 million attachment points.

On remand, American Home may demonstrate that these attachment points cannot be reached for other reasons. For example, this estimate of the years in which property damage occurred may be inaccurate. Or the evidence may permit the court to assign greater damage to the years before the inception of the two policies. We decide only that issues of material fact remain regarding American Home's liability.

---

[21]We need not address Olin's contention that the prior insurance provision applies only to a prior policy from the same insurer, as no previous policies issued by insurers other than American Home had attachment points at the same level as the American Home policies.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's grant of summary judgment to the defendant and REMAND for further proceedings.