**Michael MELONI and Dynamics Resources Group, LLC, Plaintiffs,**

v.

**RGM DISTRIBUTION, INC. d/b/a DecorPlanet.com and Robert Gavartin, Defendants.**

14-CV-5405

United States District Court, E.D. New York.

Signed August 23, 2016

Daniel S. Shimko, Salem & Shimko, P.C., 446 Avenue P, Brooklyn, NY 11223, Tel: (718) 684-6600, Fax: (718) 504-4794, dshimko@salemshimko.com, for Michael Meloni and Dynamics Resources Group, LLC

Richard C. Yeskoo, Yeskoo, Hogan & Tamlyn, LLP, 909 Third Avenue, 28th Floor, New York, NY 10022, Tel: (212) 983-0900, Fax: (212) 983-0907, Yeskoo@ yeskoolaw.com, for RGM Distribution, Inc. d/b/a, DecorPlanet.com and Robert Gavartin

## MEMORANDUM AND ORDER

Jack B. Weinstein, Senior United States District Judge:

### Table of Contents

I. Introduction...362

II. Facts...362

A. RGM Conducts Search for Consultant...362

B. RGM Hires Meloni as an Outside Consultant...363

C. RGM and Meloni Begin Negotiations to bring Meloni In-House...363

D. February 1 Term Sheet and February 10 Draft...365

E. March 4 Draft Contract...366

F. RGM Fires Meloni...368

G. Procedural History...369

III. Arguments...369

362

A. Plaintiffs' Motion for Summary Judgment...369

B. Defendants' Motion for Summary Judgment...370

IV. Law...370

A. Summary Judgment...370

B. Breach of Contract...370

V. Application of Law to Fact...371

A. Breach of Contract...371

1. Plaintiffs' Motion...371

2. February 1 Term Sheet...371

B. Meloni's Fraudulent Résumé...373

C. Quasi-Contractual Claims...373

D. Claims for Breach of Implied Covenant of Good Faith, Constructive Trust and Accounting...373

E. Individual Liability of Robert Gavartin...374

VI. Conclusion...374

## I. Introduction

This case turns on an alleged breach of an employment contract. With a high degree of probability, the contract drafted by the employer's attorney represented the parties' agreement, and, if signed, would have disposed of the employee's claims. The parties never signed, leaving a slight doubt about significant details of their agreement, if any, now being litigated at substantial expense. That uncertainty requires denial of cross-motions for summary judgment and a constitutionally mandated jury trial. The lesson is clear: if possible, the agreed upon terms of a business deal should be reduced to writing and signed by the parties.

Plaintiff Michael Meloni ("Meloni") and his company, Dynamics Resources Group, LLC ("DRG," and with Meloni, "Plaintiffs"), commenced this action against defendants RGM Distribution, Inc. d/b/a DecorPlanet.com ("RGM") and its majority owner, Robert Gavartin ("Gavartin," and with RGM, "Defendants"). Plaintiffs' claims sound in contract and quasi-contract; they seek damages representing a substantial percentage of RGM's value.

Discovery is complete. Both sides have moved for summary judgment. Defendants' motion as to Gavartin is granted and as to DRG is denied. Plaintiffs' motion is denied. The case is set for trial.

## II. Facts

RGM is a wholesaler and retailer of bathroom fixtures with sales of over twenty million dollars a year. Pls.' Response to Defs.' Statement of Undisputed Facts, June 20, 2016, ECF No. 43-2 ("Pls.' 56.1 Response"), at ¶1; Hr'g Tr., Aug. 9, 2016. It sells directly to consumers through the website www.decorplanet.com and a number of retail stores. Defs.' Response to Pls.' R. 56.1 Statement, June 17, 2016, ECF No. 42-4 ("Defs.' 56.1 Response"), at ¶2; Hr'g Tr., Aug. 9, 2016. In 2013 and 2014, Gavartin was RGM's owner and Chief Executive Officer, Steven Grebenyuk was its Chief Technology Officer, and Gary Stepanyan was its Chief Operating Officer. Pls.' 56.1 Response at ¶¶2-4.

### A. RGM Conducts Search for Consultant

In September 2013, RGM sought to hire a temporary consultant to implement "Microsoft Dynamics Great Plains," a computer software program that assists business management. *Id.* at ¶5. The program is designed to integrate all the business functions of the company, including accounting, warehousing, inventory control, and sales processing. RGM hired CCN Resources, a New York staffing agency that specialized in placing professionals. *Id.* at ¶8. RGM was looking for someone who:

- could "[e]valuate the current installation and determine if [it was] the appropriate solution for the company";

- could "[e]nsure all modules installed [were] utilized";
- could "resolve technical issues";
- had "MS Dynamics expertise including knowledge of all the different modules";
- "Strong Project manager skills—including contract and vendor evaluations";
- had "previous experience evaluating and implementing MS Dynamics solutions for clients"; and
- would "be available for off hours meetings with the manager including weekends."

Defs.' 56.1 Response at ¶¶ 15-16. There is no indication that RGN required any specific educational degrees or professional certifications. *Id.* at ¶ 19.

CCN conducted a search and submitted candidates' names, including plaintiff Meloni's. Pls.' 56.1 Response at ¶¶ 11-12. Meloni's résumé contained the following credentials:

- MBA—Executive MBA Program, University of Washington;
- CPA—Certified Public Accountant (Expired);
- CMA—Certified Managerial Accountant (Expired);
- PMP—Project Management Institute Project Management Professional;
- MCSE—Microsoft Certified Systems Engineer;
- MCTS—Microsoft Certified Technology Specialist;
- MS SQL DBA—Microsoft SQL Data Base Administrator;
- CAE—Microsoft Certified Account Executive;
- CAAS—Microsoft Great Plains Dynamics Master Applications Specialist;
- CIIS—Microsoft Great Plains Dynamics Installation Specialist; and

- MCITP CRM—Microsoft Certified IT Professional for Microsoft Dynamics CRM.

Aff. of Richard C. Yeskoo, May 27, 2016, ECF No. 38-4 ("Yeskoo Aff."), at Ex. 3; *see also* Decl. of Robert Gavartin, May 20, 2015, ECF No. 38-1 ("Gavartin Decl."), at Ex. 1.

In fact, plaintiff's résumé was mendacious. Meloni did not have an Executive MBA from the University of Washington, had never been certified as a CPA by the State of Utah or anywhere else, had never obtained a CMA or PMP certification, and had never been a Microsoft Certified Systems Engineer, a Microsoft Certified Technology Specialist, a Microsoft SQL Data Base Administrator, a Microsoft Certified Account Executive, or a Microsoft Certified IT Professional for Microsoft Dynamics CRM. Pls.' 56.1 Response at ¶¶ 16-23, 27. Meloni concedes he lied. *See* Hr'g Tr., Aug. 9, 2016.

## B. RGM Hires Meloni as an Outside Consultant

On August 5, 2013, RGM hired Meloni through CCN; CCN was paid directly by RGM for Meloni's services. Defs.' 56.1 Response at ¶ 39; Pls.' 56.1 Response at ¶ 35; Hr'g Tr., Aug. 9, 2016. Pursuant to the agreement between RGM and CCN, Meloni began working for RGM as an employee of CCN on September 2, 2013, paid at a rate of $135 an hour plus overtime. Defs.' 56.1 Response at ¶ 45, 80. CCN paid Meloni for his work, and billed RGM. Pls.' 56.1 Response at ¶¶ 35-36; Hr'g Tr., Aug. 9, 2016.

## C. RGM and Meloni Begin Negotiations to bring Meloni In-House

In late January 2014, RGM entered into negotiations with Meloni for a direct contract between them. Pls.' 56.1 Response at ¶ 38. On January 30, 2014, Meloni sent a

proposal for a consulting agreement. The summary terms included hourly compensation, an ownership interest in RGM, retirement benefits, work for his son, and an arbitration clause:

> Rob,
>
> You asked me to draft my understanding of an agreement that would work between me and [RGM]. This is what I came up with:
>
> 1. I earn $80 per hour (Includes Ryan) 1099 and can work 40-70 hours a week as necessary to support [RGM's] needs. This translates to $170,000 annual on 40 hours per week of work and includes my paying my Son Ryan Meloni for his [RGM] work at $10 per hour. In the alternative, [RGM] can hire and pay Ryan Meloni an equivalent W-2 wage of $15 per hour.
>
> 2. Each year I earn a Payout % based on the following Schedule:
>
>> *2.1. 1% on February 1st 2014,*
>>
>> 2.2. 1% on February 1st 2015,
>>
>> 2.3. 1% on February 1st 2016,
>>
>> 2.4. 1% for each year thereafter if [RGM] does not cash me out and I am still performing services.
>
> 3. 1-3% ownership (The Payout %) in the company to be distributed as follows:
>
>> 3.1. 1-3% (The Payout %) upon sale of the company on before February 1st, 2017 years.
>>
>> 3.2. 1-3% (The Payout %) of distributions made to stockholders from a partial sale of the company or a division of the company.
>>
>> 3.3. If the company does not sell by February 1st, 2017, then 1-3% (The Payout %) of the value of the company as determined by the average between two professional business appraisers, one for the company and one for me. OR if the company is unable to fund this payout because no sale partial or divisional has been made, it may pay $10,000 per month for 12 months commencing February 1st 2017 until February 1st 2018, then at that time pay the 1-3% is paid out. The purpose of this clause is to create a retirement cash flow for me until [RGM] can fund the payout and to incentivize [RGM] to make the payment.
>
> 4. In the event of a disagreement, we agree to use arbitration and not Courts.
>
> Does this work for you?

Gavartin Decl. at Ex. 3 (emphasis added). The reference in paragraph "2" to the date 2014, italicized, suggests that if he *started* work in 2014, his claims to receive a capital payment would begin.

Gavartin replied that those terms were "not what we agreed upon." *Id.*

Meloni re-sent his prior e-mail with the clarification "Steve Corrected me. He says that it is 2% up to $49 million and 3% above that." Decl. of Daniel Shimko, May 27, 2016, ECF No. 39-1 ("Shimko Decl."), at Ex. E.

On January 31, 2014, Gavartin forwarded Meloni's proposal to two other RGM executives with comments and a note that the company's lawyer would be finishing a formal contract that day with Gavartin's modifications as follows:

> My modifications of this contract that Felix [RGM's attorney] will finish today.
>
> 1. Remove $80 and make it $67.3 per hour.
>
> 2. Remove any mention of his son
>
> Under 50mm
>
> *Change the commencement to 2015,* 2016, 2017
>
> *Over 50mm 2015,* 2016, 2017

Michael gets 3% of the total sale only if the company sells for 50mm no matter when

3. If the company does not sell by 2018 (not 2017 change it) The company pays him $10,000 per month for 24 months. This will be deducted from his final payout.

Termination:

For cause he gets nothing

If he leaves within 3 years he gets nothing

After 3 years he is fully vested, however in order to get the full 3% he has to stay on board for the next 2 years with the same salary as before + 10,000 per month which will be deducted from final pay. For him to stay on board the next 2 years after the 3 year period and collect the salary is at the discretion of the company.

*Id.* (emphasis added). The references to 2015, italicized, instead of 2014 in Gavartin's proposal, *supra,* suggests that plaintiff would have to work a year before his capital claims would begin. In fact, he worked less than a year before being fired.

### D. February 1 Term Sheet and February 10 Draft

On February 1, 2014, Gavartin and Meloni had a conference with RGM's attorney; they discussed the terms of an agreement to be memorialized in a formal document. Defs.' 56.1 Response at ¶ 72. Gavartin sent Meloni an email later that day with changes to Meloni's proposal. This e-mail suggested an agreement signed by RGM had been entered into, subject to formalization. It read:

> I'm happy to say that *we have a signed offer between [RGM] and Michael Meloni.* Only question that we have to address is that 10yr payout schedule is too long. We need To [sic] come up with a way to shorten it or put interest. Myself and Michael Went [sic] through every point in detail and

we are both happy with what was at the table.

> An official contract will follow by Monday or Tuesday at the latest.

Gavartin Decl. at Ex. 4 (emphasis added).

Attached to this e-mail was Meloni's January 30, 2014 e-mail terms, as well as additional text with substantial new details of the understanding as follows:

> 1. Remove $80 and make it $65 per hour (he can work up to 60 hours per week)
>
> — His work time is office based unless permitted by upper management.
>
> 2. Remove any mention of his son
>
> Under 50mm
>
> *Change the commencement to 2015, 2016, 2017*
>
> *Over 50mm 2015, 2016, 2017*
>
> Michael gets 3% of the total sale only if the company sells for 50mm no matter when
>
> 3.1 If Michael or us decide to go separate ways (after 3 years) [RGM] pays out michaels [sic] share at 10K per month until the balance is reached based on end of 2016 independent eval
>
> 3.2 If Michael willingly leaves before 3 year commencement period, he gets nothing
>
> 3.3 If Michael's employment terminates for anything but cause, we do independent evaluations and buy him out paying 10K per month until his vested shares are paid out.
>
> 3.4 If Michael can't perform his duties due to death, disability or jail we buy him out paying 10K per month until balance of his vested shares gets satisfied.
>
> 3.5 Michael is allowed to take maximum 15 business days [sic] worth of vacation time (unpaid)

*Termination:*

*For cause he gets nothing*

Only question that we have is that 10yr payout schedule is too long. Come up with a way to either put percentage above the payout (Interest) or a shorter period for payout.

Gavartin Decl. at Ex. 4 ("February 1 Term Sheet") (emphasis added). The italicized reference to 2015 again suggests one year of employment before capital claims become payable.

The February 1 Term Sheet reduced Meloni's compensation to $65 an hour and the number of hours he could work per week was capped at 60. *Id.*; Defs.' 56.1 Response at ¶¶ 66, 81. At the hearing on the summary judgment motions, the parties agreed that this February 1 Term Sheet was adopted by both parties, and that it evidences the contract between them. *See* Hr'g Tr., Aug. 9, 2016, at 21:1-22:5; *but cf.* contradiction in *infra* Part II.E. It was sent to RGM's attorney for conversion into a formal agreement. Defs.' 56.1 Response at ¶ 67.

On February 10, 2014, Gavartin forwarded to Meloni a draft contract to formally memorialize the agreement. *Id.* at ¶ 73; Shimko Decl. at Exs. G and N. Meloni returned the draft with only one change to a paragraph concerning termination for cause: Meloni wanted to insert the phrase "his heirs and assignees" in section 5(c) of the draft. Defs.' 56.1 Response at ¶ 77.

## E. March 4 Draft Contract

RGM presented Meloni with a revised draft on March 4, 2014, and indicated that it was prepared to sign the agreement. *Id.* at ¶¶ 78-79; Shimko Decl. at Ex. I ("March 4 Draft Contract"). Meloni never executed this agreement. Pls.' 56.1 Response at ¶ 44. Instead, he explains, he took the draft to his own attorney for review. Meloni argues that he "did not want to change the terms of the contract sent to him on March 4,

2014." Pls.' Mem. of Law in Supp. of their Mot. for Summ. J., May 27, 2016, ECF No. 39-4 ("Pls.' Mem."), at 12; *see also* Decl. of Michael Meloni in Supp. Of Pls.' Mot. For Summ. J., May 27, 2016, ECF No. 39-2, at ¶ 9 ("The March 4, 2014 version of the agreement accurately reflects our agreement."). But at the hearing on the motions for summary judgment, Meloni argued— apparently contradicting his statement that it did evidence the agreement, as noted in *infra* Part II.D.—that the March 4 Draft Contract did not represent the agreement of the parties in all respects. *See* Hr'g Tr., Aug. 9, 2016, at 20:17-25.

The termination provisions in this March 4 Draft Contract dealt with the basis for termination of Meloni's services in detail. Paragraphs (a) and (b) cover termination for cause. Paragraph (c) permits termination by RGM without cause "after the Initial Term," which is defined as three years after the contract is entered into:

(a) *The Company may terminate this Agreement for Cause on ten days' prior notice.* As used herein, "Cause" shall mean: (i) the Principal shall be physically or mentally incapacitated or disabled (as determined by an independent physician selected by the Board of Directors of the Company) or otherwise unable fully to discharge his duties hereunder for a period of six (6) consecutive weeks; (ii) Principal's death; (iii) Principal shall be convicted by, or shall have entered a plea of guilty or nolo contendere in, a court of competent and final jurisdiction for any crime involving moral turpitude, fraud, embezzlement, misappropriation, or any other felony or crime punishable by imprisonment[;] (iv) Principal shall commit any act of fraud, embezzlement or other act of misappropriation[;] (v) in the event the Principal transfers any interest in the Independent Contractor to a third

party[;] or (vi) Principal shall fail or refuse to perform in any material respect his duties as required hereunder, and fail to correct such breach *within ten (10) business days after notice from the Board of Directors in writing.*

(b) If the Company terminates this Agreement for Cause under Section 5 (a) (iii), (iv), (v) or (vi), or if the Independent Contractor chooses to terminate this Agreement at any time during the Initial Term, the Company's only obligation shall be to pay the compensation referenced in Section 2 [$65 per hour] through the date of such termination, and Independent Contractor shall lose all rights to Contractor Sale Proceeds.

(c) If the Company terminates this Agreement for Cause under Section 5 (a) (i) or (ii); or if the Company terminates this Agreement without Cause, then Independent Contractor, and or his heirs, shall be entitled to the Contractor Sale Proceeds as if a Company Sale took place on such termination date based on years of service through such termination date, with the calculation of Net Proceeds in section 4d and payment terms in section 4d.

(d) If the Independent Contractor chooses to terminate this Agreement at any time after the Initial Term, then Independent Contractor shall continue to be entitled to the payment under Section 4d.

Shimko Decl. at Ex. I, § 5 (emphasis added).

Section 4(d) of the March 4 Draft Contract specifies a method of valuing the company for purposes of determining Meloni's share of capital if it were sold during the "Initial Term":

d. In the event, no Company Sale occurs during the Initial Term [three years from effective date of the contract], on or about December 2016, the Company shall engage an independent third party appraiser ("Company's Appraiser") to determine the fair market value of the Company, assuming that the business of the Company is sold at fair market value . . . .

*Net Proceeds shall then be subject to the formula in sections (a) or (b) to determine Contractor Sale Proceeds . . . .* Company shall pay Independent Contractor its Contractor Sale Proceeds in monthly installments of ten thousand ($10,000) dollars per month beginning one month after the expiration of the Initial Term for a period of up to two (2) years, thereafter any remaining Contractor Sale Proceeds shall be paid in equal monthly installments over the next succeeding (2) year period. Should there be a Company Sale after the Initial Term, any unpaid portion of the Contractor Sale Proceeds shall be immediately due and payable to Independent Contractor.

*Id.* at Ex. I, § 4(d) (emphasis added).

Sections 4(a) and 4(b) provide the formulas for calculating "Net Proceeds" of a sale of the company on a full sale during the "Initial Term." They state:

a. In the event of a Full Sale, during Initial Term, for Net Proceeds (as defined below) of less than fifty million ($50,000,000.00) dollars ("Low Company Sale"), Independent Contractor shall be entitled to participate in same, *provided Independent Contractor is engaged for at least one (1) year by Company,* and receive one third (1/3) of two (2%) percent of the Net Proceeds for the first full year of engagement for the Company, and one thirty sixth (1/36) of two (2%) percent for each full month of engage-

ment completed thereafter by Independent Contractor up to a total a [*sic*] maximum of two (2%) percent of said Net Proceeds.

. . .

b. In the event of a Full Sale, during the Initial Term, for Net Proceeds equal to or greater than fifty million ($50,000,000.00) dollars ("High Company Sale"), Independent Contractor shall be entitled to participate in same, *provided Independent Contractor is engaged for at least one (1) year by Company,* and receive one third (1/3) of three (3%) percent of the Net Proceeds for the first full year of engagement for the Company, and one thirty sixth (1/36) of three (3%) percent for each full month of engagement completed thereafter by Independent Contractor up to a total a maximum of three (3%) percent of said Net Proceeds.

*Id.* at Ex. I, §§ 4(a)-(b) (emphasis added).

Critical language in 4(a) and 4(b) immediately above is: *"provided Independent Contractor is engaged for at least one (1) year by Company."* As detailed below, this language seems to require that Meloni have been employed for at least one year before any share of RGM's capital became due to him. *See* discussion, *infra* Part V.A.2. As argued by Defendants, Meloni did not serve for one year, so, whether fired for cause or not, he has no claim. *See infra* Part III. But, the March 4 Draft Contract was not signed by Meloni.

### F. RGM Fires Meloni

The Microsoft Dynamics Great Plains program was not operational while Meloni was employed as a consultant by RGM. Pls.' 56.1 Response at ¶ 34.

Meloni was fired on May 30, 2014, approximately nine months after he started work as an external consultant on September 2, 2013, and approximately four months after he started work as an in-house employee under the February 1 Term Sheet. Defs.' 56.1 Response at ¶ 88. According to Plaintiffs, this occurred shortly after Meloni handed over a "near finished product and roadmap to completion for the ERP implementation." Pls.' Mem. at 13.

Defendants contend that Meloni was fired for cause—poor work performance:

> During the spring of 2014, we became increasingly dissatisfied with Meloni's performance. The implementation project, which was originally scheduled to be completed by the end of 2013, was dragging on with no end in sight. After consulting with Grebenyuk [RGM's Chief Technology Officer] and Stepanyan [RGM's Chief Operating Officer], I concluded that Meloni was inept at project management and could not identify or implement the key events that needed to be accomplished to complete the project. He could not come up with a realistic training plan, and could not professional work with and motivate other employees in the Company.
>
> I decided to terminate Meloni's consulting agreement with RGM based upon his poor performance and other factors detrimental to the company . . . .

Gavartin Decl. at ¶ 14-15; *see also* Decl. of Steven Grebenyuk, May 20, 2015, ECF No. 38-2 ("Grebenyuk Decl."), at ¶¶ 12-13.

Meloni was not provided with any written notice from the Board of Directors that he would be terminated if he failed to cure the alleged breach of his duties within ten days; notice—Meloni claims—required by the terms of the parties' agreement. Defs.' 56.1 Response at ¶ 95.

### G. Procedural History

Plaintiffs commenced this action in September 2014. *See* Compl., Sept. 15, 2014, ECF No. 1. They claim breach of "a valid oral contract" entered into on February 1, 2014, which was "evidenced by writing." *See id.* at ¶¶ 32-38. They also rely on promissory estoppel, *quantum meruit*, breach of the implied covenant of good faith, and constructive trust and accounting. *See id.* at ¶¶ 39-58. They are not seeking compensation for lost wages, but only for the value of the percent of RGM Meloni claims he was entitled to under an alleged agreement.

Defendants answered the complaint, generally denying its allegations. *See* Answer, Oct. 6, 2014, ECF No. 5; First Am. Answer, Oct. 16, 2015, ECF No. 28. On July 16, 2015, Defendants made an offer of judgment to Plaintiffs pursuant to Federal Rule of Civil Procedure 68 for $10,001. *See* Offer of Judgment, July 16, 2015, ECF No. 14. Plaintiffs rejected the offer.

## III. Arguments

### A. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on the ground that a valid contract was entered into, Meloni was not fired for cause as it is defined in the contract, and RGM breached the contract by failing to pay Meloni a percentage of capital owed under Section 5 of the contract. Pls.' Mem. at 15-22. Although the complaint alleges an oral contract, Plaintiffs' memorandum of law relies on the February 1 Term Sheet and March 4 Draft Contract as the agreement which was breached. *See* Pls.' Mem. at 15 ("It is not necessary for Defendant to have signed Exhibit F [February 1 Term Sheet], or Exhibit I [March 4 Draft Contract] to be bound by his agreement with Plaintiff."), 16 (referring to "accepting the terms in Ex. [I]" (marked 1 in error)), 18 (citing termination provisions in Exhibit I).

With respect to Meloni's résumé, Plaintiffs make two arguments. First, they contend that there is no evidence that Defendants ever received or relied on misrepresentations. Second, they assert that the misrepresentations were not material since the person who took over from Meloni, Chief Technology Officer Steven Grebenyuk, had no college degree or formal training in the relevant technology. *Id.* at 23-27.

In opposition, Defendants point to the language of the February 1 Term Sheet and the language in the March 4 Draft Contract, arguing that under either document Meloni is not entitled to compensation. Specifically, Defendants note that point 3.3 of the February 1 Term Sheet provides "If Michael's employment terminates for anything but cause, we do independent evaluations and buy him out paying 10K per month until balance of his *vested shares* gets satisfied." Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J., June 17, 2016, ECF No. 42 ("Defs.' Opp'n Mem."), at 1-2 (quoting February 1 Term Sheet) (emphasis added). Because, they argue, the vesting of shares was not to begin until February 2015 under that draft, Meloni is not entitled to any payout. *Id.* at 2. Alternatively, they contend that the March 4 Draft Contract provides that Meloni would only be entitled to a share of the sale proceeds if he had been with the company for at least one year. *Id.* at 4. In fact, he arguably served for only four months.

Separately, Defendants argue that they had "cause" to fire Meloni, an undefined term on the February 1 Term Sheet and a term defined to include "fraud" in the March 4 Draft Contract. Under both documents, termination for cause resulted in no right to any capital payments. *Id.*

## B. Defendants' Motion for Summary Judgment

Defendants make three arguments in support of their summary judgment motion. First, they argue that Plaintiffs' claims are barred as a result of Meloni's resume fraud. They contend that Meloni fraudulently induced RGM to hire him by lying about his qualifications. As a result, Defendants argue, the employment contract is voidable, barring Plaintiffs' claims. *See* Mem. in Supp. of Defs.' Mot. for Summ. J., May 27, 2016, ECF No. 38-7 ("Defs.' Mem."), at 10-13.

Second, Defendants argue that even if the February 1 Term Sheet or the March 4 Draft Contract is enforceable, Meloni is not entitled to any capital compensation under the agreements' plain terms. With respect to the February 1 Term Sheet, Defendants point out that the agreement provides for no compensation in the event that Meloni is fired for cause. Moreover, the February 1 Term Sheet provides that if employment is terminated for anything but cause, Meloni will receive a payout on the value of his vested shares, but no shares were to vest until plaintiff was employed to February 1, 2015. *Id.* at 13-14. Defendants note that the March 4 Draft Contract also provides no compensation if Meloni's employment is terminated for cause. *See* Gavartin Decl. at Ex. 5, § 5. The draft contract also indicates that if Meloni is terminated without cause, he is entitled to compensation based on a hypothetical sale of the company, but only if he had been employed for at least one year. *Id.* at Ex. 5, § 4.

Third, Defendants argue that all claims against Gavartin as an individual should be dismissed because he is not a party to any of the alleged agreements in his individual capacity. Defs.' Mem. at 15-16.

## IV. Law

### A. Summary Judgment

"A motion for summary judgment may properly be granted ... only where there is no genuine issue of material fact to be tried ...." *Rogoz v. City of Hartford,* 796 F.3d 236, 245 (2d Cir.2015) (quoting *Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir.2010)). "No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor." *Bank of Am., N.A. v. Fischer,* 927 F.Supp.2d 15, 25 (E.D.N.Y.2013) (citing *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 86 (2d Cir.1996)).

### B. Breach of contract

■ "To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Orlander v. Staples, Inc.,* 802 F.3d 289, 294 (2d Cir.2015) (quoting *Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 142 (2d Cir.2011)).

■ "[A] contract is defined under New York law [as] an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Fisher v. Int'l Student Exch., Inc.,* 38 F.Supp.3d 276, 282 (E.D.N.Y.2014) (quotation omitted). "[T]here must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.,* 887 F.Supp.2d 459, 470 (E.D.N.Y.2012) (quotation omitted). There does not need to be a signed writing: "The New York Court of Appeals 'ha[s] long

held that a contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute ... that imposes such a requirement.'" *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 124 (2d Cir.2011) (quoting *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 368, 795 N.Y.S.2d 491, 828 N.E.2d 593, 596 (2005)). As long as objective evidence of an intent to be bound exists, an unsigned contract may be enforced. *Id.*

■ A term sheet may be enforced as a contract where it contains all the material terms and the drafting and execution of a formal contract are "merely ministerial." *Local Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of NY, LLC*, 469 F.Supp.2d 80, 86–87 (E.D.N.Y.2007) ("[A] term sheet or letter of intent that provides that the parties 'will proceed to draft a formal agreement implementing these terms' is a binding contract, for the formality is presumed to be a ministerial act ....").

■ In construing a contract, where the plain language of the agreement "is clear and unambiguous, the contract is to be given effect according to its terms." *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 31 (2d Cir.2016) (quoting *Lee v. BSB Greenwich Mortg. Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir.2001)). In such a case, resort to extrinsic evidence is inappropriate. *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir.2012). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990)). A term is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp.*, 704 F.3d at 99 (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996)).

## V. Application of Law to Fact

### A. Breach of Contract

#### 1. Plaintiffs' Motion

Plaintiffs' motion for summary judgment is premised on the terms in the March 4 Draft Contract. *See* Pls.' Mem. at 21-22. As already stated, however, Plaintiffs argued at the hearing that the March 4 Draft Contract does not represent the agreement of the parties. *See* Hr'g Tr., Aug. 9, 2016. Under either view, their motion for summary judgment is denied.

#### 2. February 1 Term Sheet

■ The parties stipulated at the summary judgment hearing that the February 1 Term Sheet is an enforceable agreement that controls the instant dispute. *See* Hr'g Tr., Aug. 9, 2016 at 21:1-22:5.

Under the terms of the February 1 Term Sheet and January 30, 2014 proposal, were Meloni's employment terminated for cause, he would receive no additional compensation based on the value of RGM. *See* Gavartin Decl. at Ex. 4 (February 1 Term Sheet) ("Termination: For cause he gets nothing"). If Meloni were terminated "for anything but cause," Meloni would be paid $10,000 "per month until his vested shares are paid out." *Id.* The parties disagree about what this last statement means.

Defendants point to the February 1 Term Sheet (which Gavartin's modifications to Meloni's original January 30 proposal). Defendants argue that Gavartin's edits changed the dates on which Meloni would become entitled to compensation based on the value of the company, from 2014, 2015, and 2016, to 2015, 2016, and 2017. In short, Defendants argue that until

Meloni had worked for RGM for a period of one year, under the February 1 Term Sheet (February 1, 2014 to February 1, 2015) he would not be entitled to any percentage of the company. Because Meloni's services ended prior to February 1, 2015, he had no vested shares to be paid out and is not entitled to any further compensation.

Plaintiffs contend that the February 1 Term Sheet is ambiguous on this point of the need for one year of employment, and look to contemporaneous evidence to bolster their argument. *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., June 20, 2016, ECF No. 43 ("Pls.' Opp'n Mem."), at 6-8. "[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 397 (2d Cir.2009). Both parties rely on the March 4 Draft Contract as relevant, contemporaneous evidence of the parties' intentions. *See* Pls.' Opp'n Mem. at 8; Defs.' Mem. at 14-15.

The March 4 Draft Contract was derived from the February 1 Term Sheet. Under its terms, Meloni could be terminated for cause or for no cause. If he was terminated for cause, as defined by Sections 5(a)-(b), he would be entitled to no additional compensation. *See* Shimko Decl. at Ex. I.

If he was terminated without cause, then he would be entitled to "the Contractor Sale Proceeds as if a Company Sale took place on such termination date based on years of service through such termination date, with the calculation of Net Proceeds in section 4d and payment terms in section 4d." *Id.* at § 5(c). Section 4(d), in turn, refers to Sections 4(a) and 4(b) to determine the Net Proceeds and the Contractor Sale Proceeds. Both Sections 4(a) and 4(b) contain a requirement that in order for Meloni to receive any of the Net Proceeds, *he must have been "engaged for at least one (1) year* by Company." *Id.* at §§ 4(a)-(b) (emphasis added). This one-year requirement is consistent with the changes Gavartin made to the February 1 Term Sheet, entitling Meloni to a share of the company only after he worked for RGM for one year.

As demonstrated above, it is possible for the facts and the law to be analyzed to require the dismissal of Plaintiffs' claims. Applying the New York Court of Appeals' decision in *Gallagher v. Lambert,* 74 N.Y.2d 562, 549 N.Y.S.2d 945, 549 N.E.2d 136 (1989), which appears to have contradicted an earlier decision of the Court of Appeals for the Second Circuit, *Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109 (2d Cir.1985), it would be valid for RGM to fire Meloni without cause a moment before the end of his first year of employment and cut him off from compensation based on the value of the company.

The equities of the situation breathe some uncertainty into that conclusion:

- Defendants' reading of the agreement would permit them to fire Meloni one minute before February 1, 2015 (per the February 1 Term Sheet) or 1 minute before his one-year anniversary (per the March 4 Draft Contract), retaining the benefits of his work and depriving him of any compensation beyond that of his hourly rate;

- Neither the February 1 Term Sheet nor the March 4 Draft Contract is crystal clear. The conclusion that Defendants rely upon requires review of multiple documents, the combination of separate contractual provisions, and a complex analysis;

- It may be that Meloni, the less sophisticated of the two parties, did not show the critical February 1 Term Sheet, which was drafted by RGM's counsel, to his own attorney;

- It is not clear that the March 4 Draft Contract, with its killer one-

year provision, was signed or explicitly approved by Meloni. There is no indication that Meloni or his attorney responded to the March 4 Draft Contract;

- It is not clear what the effect of the New York Court of Appeals' *Gallagher* decision is on this situation. *Gallagher* appears to constitute a reversal, at least by implication, of the flagpole rule that one cannot revoke an offer just before the climber reaches the top of the flagpole and be spared all liability for damages. In the first year law school hypothetical, A says to B, "If you climb to the top of that flagpole, I'll give you $1,000." B says, "I accept," and begins to climb. Just before B reaches the top, A shouts, "I revoke." What are the legal consequences? *See, e.g.,* 1 Samuel Williston & Richard A. Lord, Williston on Contracts § 5:13 (4th ed. 1990) ("As a theoretical matter, when an offeror makes an offer to enter into a unilateral contract, he or she should be free to withdraw the offer at any time until performance has been completed by the offeree. However, great injustice may arise if the offeror's power of revocation continues so long."). This result is troubling. District courts in the circuit are divided over *Gallagher*'s impact on the Court of Appeals for the Second Circuit's decision in *Wakefield,* which permitted the jury to consider whether an employer's termination was for the sole purpose of avoiding promised compensation. *See Bravia Capital Partners, Inc. v. Fike,* No. 09–CV–6375, 2010 WL 3359470, at *6 (S.D.N.Y. Aug. 25, 2010) (noting that *"Wakefield* 's continued validity ... is unclear" and collecting cases, but holding *Gallagher* to be distinguishable on the facts and *Wakefield* 's holding in employment commission cases to be good law). De-

fendants' motion for summary judgment on Plaintiffs' breach of contract claim is denied. The matter should be decided by a jury.

### B. Meloni's Fraudulent Resume

■ The issue of Meloni's fraudulent résumé and the materiality of its misrepresentations go to the question of whether RGM had "cause" to terminate Meloni. "Cause" is not defined in the February 1 Term Sheet, which governs the parties' relationship.

Defendants were aware of the fraudulent résumé prior to firing Meloni. *See* Yeskoo Aff. at Ex. 3. Whether the misrepresentations constitute "cause" under the February 1 Term Sheet is a question that should be decided by a jury.

### C. Quasi-Contractual Claims

Because the parties agree that a contract exists, Plaintiffs' quasi-contractual claims (promissory estoppel and *quantum meruit*) will be dismissed. *See Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy,* 449 Fed.Appx. 57, 59 (2d Cir. 2011) ("Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in ... unjust enrichment, implied and quasi contract, and quantum meruit, are generally precluded ...."); *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 587 (2d Cir.2006).

The *quantum meruit* claim may be relied upon at trial if Defendants used Plaintiffs' work product after they fired Meloni without cause.

### D. Claims for Breach of Implied Covenant of Good Faith, Constructive Trust and Accounting

The complaint's claims for breach of an implied covenant of good faith and con-

structive trust and accounting cannot be dismissed on summary judgment. The validity of these claims requires resolving the ambiguities in the February 1 Term Sheet. If a jury finds that the February 1 Term Sheet required no further payment to Meloni, then these claims cannot stand. A jury should make that determination.

### E. Individual Liability of Robert Gavartin

 Summary judgment is appropriate on Plaintiffs' claims against individual defendant Robert Gavartin. There is no evidence that Gavartin made any agreement in his individual capacity. Without any evidence of an *alter ego* relationship, he is protected by the corporate shield. Plaintiffs' conclusory assertion that Gavartin is personally liable on a contract that he agreed to in his corporate capacity is unsupported.

## VI. Conclusion

The evidence can be construed to show that the parties reached some form of an agreement. What the terms of that agreement are is not clear enough to warrant summary judgment.

Plaintiffs' motion for summary judgment, which is based on a document that may not be the parties' full agreement, is denied.

Defendants' motion for summary judgment on Plaintiffs' breach of contract, breach of implied covenant of good faith, and constructive trust and accounting claims is denied.

In light of the parties' agreement that a contract exists, Defendants' motion for summary judgment on Plaintiffs' promissory estoppel and *quantum meruit* claims is granted.

Summary judgment with respect to all claims against Gavartin in his individual capacity is granted. He is dismissed from the case.

The questionable probative force in Plaintiffs' evidence suggests that Plaintiffs' case has little merit. A jury's findings are likely to be heavily influenced by Meloni's admitted lying about qualifications on his resume. Additionally, Defendants have indicated that they were forced to incur significant additional expense to complete the project Meloni purportedly bungled. Plaintiffs, who believe they are entitled to significant compensation, may end up owing Defendants significant costs of the litigation.

Defendants may face a substantial jury verdict.

Settlement should be seriously considered. Reference to the magistrate judge or court annexed mediation for assistance in settlement respectfully is ordered.

A conference to set a trial date shall be held on September 12, 2016, at 10:30 a.m. in Courtroom 10 B South.

SO ORDERED.